IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICOLE D'AGOSTINO and CHELSEA )
SCHNEIDER, Individually, and )
on Behalf of All Others )
Similarly Situated, )
    )
    Plaintiff, )
    )
vs. )  No. 1:12-cv-9162
    )
#7 ZIMMIE'S, INC., d/b/a THE )
ORIGINAL PANCAKE HOUSE, LISA )
LAROCHE-SCZUREK, and STEVE )
SCZUREK, )
    )
    Defendants. )

30(b)(6) DEPOSITION OF STEVEN STANLEY SCZUREK

The 30(b)(6) deposition of STEVEN STANLEY SCZUREK was taken by ANDREW ROBERT PITTS, C.S.R., R.P.R., pursuant to the applicable provisions of the Illinois Code of Civil Procedure and the Rules of the Supreme Court of the State of Illinois, pertaining to the taking of 30(b)(6) depositions at 205 North Michigan Avenue, Suite 2560, in the City of Chicago, Cook County, Illinois, commencing at 10:37 a.m. on November 6th, 2013.

REPORTED BY: ANDREW ROBERT PITTS, CSR, RPR
LICENSE NO.: 084-004575

APPEARANCES:

STEPHAN ZOURAS LLP
BY: MR. JAMES B. ZOURAS
jzouras@stephanzouras.com
205 North Michigan Avenue
Suite 2560
Chicago, Illinois 60601
312-233-1550
    appeared on behalf of Plaintiff;

GORDON & REES LLP
BY: MR. ROBERT D. CONNEALY
rconnealy@gordonrees.com
One North Franklin Street
Suite 800
Chicago, Illinois 60606
312-565-1400
    appeared on behalf of Defendants.

INDEX

STEVEN S. SCZUREK    EXAMINATION
By Mr. Zouras    4, 191
By Mr. Connealy    187

EXHIBITS
    MARKED
SCZUREK    PAGE
Exhibit 1  Preparation notes, six pages  9
Exhibit 2  Notification sheet for servers  54
Exhibit 3  List of servers 2009-2010  71
Exhibit 4  Pages from employee handbook,  77
    April of 2009
Exhibit 5  Job description for server  112
Group 6    Paycheck stub for Chelsea  126
    Schneider 9/16/12
Exhibit 7  Server sideboard chart  142
Exhibit 8  Summary of sales, cost of  157
    food, cost of cooks from
    income statements
Exhibit 9  Employee Meals spreadsheet  162
Exhibit 10  All Sales spreadsheet  166
Exhibit 11  Discounted Meals spreadsheet  167
Exhibit 12  Summary of Meals spreadsheet  170
    November 2009-2010

(Original exhibits sent to Mr. Zouras.)

(Whereupon, the witness was administered an oath.)

STEVEN STANLEY SCZUREK, having been first administered an oath, was examined and testified as follows:

EXAMINATION

BY MR. ZOURAS:

Q. Good morning again, sir.

A. Good morning.

Q. Could you please tell us your full name and spell your last name for the record.

A. Steven Stanley Zurich. Last name is spelled S-C-Z-U-R-E-K.

Q. Do you go by Steve or Steven?

A. Steve.

Q. Is it okay if I call you Steve?

A. That's fine.

Q. All right. So, Steve, I am going to ask you a series of question back seat a lawsuit that's been filed against you and a corporation called 7 Zimmie's.

Have you ever given a deposition before?

A. I have.

Q. On how many occasions?

EXHIBIT
A of 1

5

A. One.

Q. And when was that?

A. Approximately three years ago.

Q. And were you a party in that matter?

A. I guess --

Q. Were you a person suing? Were you a person being sued? Were you a witness? Were you something else?

A. I was a person being sued.

Q. And was it in connection with your employment?

A. It was a slip and fall on a property.

Q. Was it a lawsuit filed in connection with your business, your home, something else?

A. Business.

Q. And by any chance, do you remember the name of the party that was bringing the action?

A. I do not.

Q. Do you remember where it was filed?

A. I do not.

Q. Has that matter resolved?

A. Yes.

Q. Do you know if it was filed in the state or federal court?

6

A. I don't know.

Q. Was it filed in Illinois?

A. I believe so.

Q. All right. Other than that, have you ever sat for any other depositions?

A. No.

Q. So you probably remember this from the last time, but there are a few sort of ground rules you have to go over. As you have been doing, you have to answer out loud. You have to allow me to complete asking my question before you attempt to answer it mainly for the sake of the court reporter who can only take down one person speaking at any given time.

Let me know if you don't understand a question, because I'll do my very best to rephrase it or restate it so that you do understand it, but assuming you answer without any objections, we are all going to assume that you understood the question that was asked. Fair enough?

A. I understand what you're saying.

Q. Okay. Good. If you need a break for any reason, let us know. We will be happy to accommodate you as long as a question is not

7

pending at the time. Fair?

A. Yes.

Q. Your counsel is here for us. He is allowed to make objections, but unless you are given a specific instruction to not answer a question, you are required to do so. Good enough?

A. I understand.

Q. Okay. So, Steve, where do you live?

A. Orland Park, Illinois.

Q. What is your address?

A. 10900 Green Manor Court, Orland Park, 60467.

Q. How long have you lived there?

A. Approximately two years.

Q. Who do you live there with?

A. My wife and my family, my children.

Q. What is your date of birth?

A. October 20th, 1967.

Q. What is the highest level of education you have achieved?

A. I have an MBA.

Q. From which institution?

A. St. Xavier in Chicago.

Q. When did you get that?

8

A. Approximately 1999.

Q. Any other professional licensures, training, additional education beyond your MBA?

A. I guess I don't understand the question. Is it just additional schooling, degrees, or --

Q. Yes, just schooling. Sometimes people get different certifications in the business world, you know, they attend seminars and so forth. Anything along those lines --

A. City of Chicago Sanitation license kind of thing?

Q. Not really, yeah.

A. Where do you want to draw the line?

Q. No. More directed towards your professional life.

A. No.

Q. Okay. Fair enough. Don't take offense to this next question because I have to ask it of every single person I depose.

Have you been convicted of any felonies?

A. No.

Q. Any misdemeanors involving dishonesty, like shoplifting, for example?

A. No.

9

Q.   Okay.  And you haven't been known by any other names, correct?

A.   No.

Q.   You are probably familiar with an entity called #7 Zimmie's, Inc.; is that correct?

A.   Yes.

Q.   What is the business of that entity?

A.   What is its function?

Q.   Yes.

A.   It is a restaurant.

Q.   And how long has that -- it's a corporation, yes?

A.   It is an Illinois corporation.

Q.   And it has existed for how long?

A.   I don't recall, but I know it's in my notes.

Q.   Thank you for raising that matter.  Let me show you what we will mark as Exhibit 1.

MR. ZOURAS:  Do you want to do numbers?  Numbers are great.  So Exhibit 1.

(Whereupon, Sczurek Exhibit 1 was marked for identification.)

MR. ZOURAS:  You can mark your copy.  That, I think, makes sense.  So let's try that.

10

MR. CONNEALY:  Sczurek 1?

THE REPORTER:  Sczurek 1.

BY MR. ZOURAS:

Q.   Steve, I am showing you what has been marked as Zurich Exhibit No. 1.  Do you recognize that document?

A.   I do.

Q.   What is that document?

A.   These are the notes I have put together for the preparation for the deposition.

Q.   And just so we're clear, this is a six-page document containing notes prepared by you?

A.   Correct.

Q.   Did you have any assistance in preparing this document?

A.   No.

Q.   Solely put together by you and no one else?

A.   Yes.

Q.   And by the way, what type of information does this document contain?

A.   Notes mostly regarding documents that we turned over to you.

Q.   And you prepared this specifically in

11

preparation for today's deposition?

A.   Correct.

Q.   All right.  If at any time during today's deposition you need to refer to this document to refresh your recollection to give me the best possible answer, please feel free to do so, and if you could just let me know that you are referencing it when you do so, that would be great.

A.   Okay.

Q.   All right.  So getting back to my question about how long 7 Zimmie's has been in existence, I take it you need your notes to answer that question accurately?

A.   I do.

Q.   All right.  And what is the answer to that question?

A.   It was incorporated April 27th, 1976.

Q.   Now, I take it the entity was incorporated before you became involved with it?

A.   Correct.

Q.   And how long have you been associated with the company called 7 Zimmie's?

A.   I purchased #7 Zimmie's on January 1st, 2003.

12

Q.   All right.  Are you currently the owner of #7 Zimmie's?

A.   I am.

Q.   Is anyone else an owner?

A.   Yes.

Q.   Who is that?

A.   Lisa LaRoche-Sczurek.

Q.   And who is Lisa LaRoche-Sczurek?

A.   The president.

Q.   Is she related to you?

A.   Yes.

Q.   In what way?

A.   She's my wife.

Q.   You both purchased it together on January 1st, 2003?

A.   Correct.

Q.   And have you both owned it continuously ever since?

A.   Yes.

Q.   And have there been any other owners during that time?

A.   No.

Q.   Is there a board of directors?

A.   I believe there is.

13

Q. Do you know who is on the board of directors?

A. Myself and my wife.

Q. Okay. Nobody else?

A. No.

Q. And does that entity -- strike that.

Does that entity do business as the Original Pancake House?

A. Yes.

Q. And has that been true since January 1st, 2003?

A. Yes.

Q. Where does that entity do business?

A. Are you asking me the street address?

Q. Yes.

A. 22 East Bellevue Place, Chicago, 60611.

Q. And what is located at that address? Is it an office? Is it something else?

A. No, it's the actual restaurant.

Q. It's the actual restaurant. Okay.

Does the entity called 7 Zimmie's have a management office somewhere?

A. No.

Q. Does it do business anywhere else other

14

than that one location you have already told me?

A. I guess I don't follow your question. Do I --

Q. Well, I asked where 7 Zimmie's did business, and you told me it does business at an address on Bellevue place; is that right?

A. The physical operations are you asking me about?

Q. Yes.

A. No, the only place is 22.

Q. There are no other restaurants, in other words?

A. No.

Q. And the reason I ask is because just by my observations, it seems that there are other entities called the Original Pancake House that operate elsewhere in the Chicagoland area. I take it those entities have no connection to 7 Zimmie's?

A. Correct.

Q. And they have no connection to you, correct?

A. No.

MR. CONNEALY: If we could go off the record for just one second.

15

MR. ZOURAS: Sure.

(Whereupon, a discussion was had off the record.)

BY MR. ZOURAS:

Q. #7 Zimmie's is the name for the Original Pancake House doing business at that address, right?

A. Yes.

Q. Now, does 7 Zimmie's do business or own restaurants at any other locations?

A. No.

Q. Fair enough. If we call 7 Zimmie's in this deposition the Original Pancake House, we will both know what we are talking about, hopefully?

A. We are defining it as 7 Zimmie's at 22 East Street.

Q. I am. Correct. Fair?

A. Correct.

Q. All right. Does that restaurant currently have a manager?

A. Yes.

Q. Who is that?

A. Craig Arrigoni.

Q. Is that A-R-R-I-G-O-N-I?

16

A. I believe so.

Q. How long has he been the manager at the Original Pancake House?

A. I can't give you an exact date.

Q. Can you give me your best estimate?

A. Approximately ten years.

Q. And who does Mr. Arrigoni report to?

A. Myself and my wife.

Q. Is he the only manager of that restaurant?

A. No.

Q. Who are the other managers?

A. Currently?

Q. Yes, sir.

A. Silvia Zermeno.

Q. Do you have the spelling of her name?

A. No, I don't.

Q. Okay. Anyone else?

A. Chantelle Riha.

Q. Okay. Anyone else?

A. Don Neakarse.

Q. By the way, in terms of spelling Ms. Riha's last name?

A. R-I-A-H.

17

Q. Okay. And Mr. -- is it "Neakause"?

A. Neakarse.

Q. Neakarse. Spell it for me.

A. N-E-A-K-A-R-S-E.

Q. Okay. Anyone else?

A. Carl McNair (phonetic).

Q. Carl with a K or a C?

A. C.

Q. Okay. Anyone else?

A. No.

Q. Who does Silvia report to?

A. Myself.

Q. Same thing for Ms. Riha?

A. Yes.

Q. And same thing for Mr. Neakarse and Mr. McNair?

A. Yes.

Q. All right. Do any of these persons have a title other than just manager?

A. Don Neakarse and Carl McNair.

Q. Have a different title?

A. Supervisor.

Q. And even though they have the title supervisor, they nevertheless report directly to

18

you and your wife?

A. Who?

Q. Mr. Neakarse and Mr. McNair?

A. Yes, directly to me.

Q. All right. And what are the duties -- strike that.

Does each manager have different duties?

A. Essentially the same.

Q. And what are those duties?

A. To oversee the operation of the restaurant.

Q. And how about the duties of the supervisors?

A. Similar to the managers, but also they do have some oversight on the managers.

Q. They have some oversight on the managers?

A. Yes.

Q. So in terms of a sort of a hierarchy or a chain of command, would you in your mind place Mr. Neakarse and Mr. McNair above the four managers?

A. Yes.

Q. Have we now covered all the persons who hold the title of manager or supervisor at the

19

Original Pancake House?

A. I believe so.

Q. All right. You were kind enough to prepare the notes we marked as Exhibit 1 to prepare for today's deposition. I am going ask you if you did anything else to prepare for today's deposition.

A. I reviewed all the documents that we put together.

Q. How long did that take you?

A. Eight hours.

Q. These would be the documents that your attorneys have turned over in discovery?

A. Yes.

Q. And did you do anything else?

A. Prepare the notes.

Q. And you probably spoke to your counsel, right?

A. Yes.

Q. And that is perfectly appropriate.

Did you speak to anybody else?

A. Yes, some of my staff.

Q. And who would that be?

A. The managers.

20

Q. All of them?

A. I would say not -- excluding Don Neakarse and Carl McNair.

Q. Okay.

A. Specifically about this.

Q. So you would have spoken to the four managers, not including Mr. Neakarse and Mr. McNair, about the deposition today?

A. No, about the information preparing for the deposition.

Q. Fair enough. So in other words, the information contained, for example, in Exhibit 1, you prepared yourself and you would have also gotten some of that information from the four managers we discussed earlier?

A. I'm sorry. Could you repeat the question one more time.

Q. Sure. You were kind enough to tell us before that there were a number of persons with the title of manager, and maybe I need to get this straight. That's Craig, Silvia, and Chantelle; is that right?

A. Yes.

Q. And there are two individuals with the

21

title of supervisor, and that's Don and Carl, yes?

A. Yes.

Q. And you would have met with some or all of these persons to prepare for today's deposition?

A. Yes.

Q. And all I am trying to do is figure out which ones.

A. Chantelle, Craig, and Silvia.

Q. Did you meet with them all at the same time?

A. No.

Q. Did you meet with each one on one?

A. Yes.

Q. And when did you meet with Craig about today's deposition?

A. I don't recall the exact day.

Q. Was it within the last week or so?

A. I'd say approximately two weeks ago.

Q. And what did you guys discuss?

A. I just asked him about some of the procedures that we use in the restaurant just to keep following our quality procedures.

Q. Did any of those procedures concern any of the wage and hour matters we are discussing here

22

today?

A. Some of them.

Q. Did the discussions concern how servers are paid?

A. No.

Q. Did discussions concern how servers are trained?

A. No.

Q. Did the discussions concern the information provided by your restaurant to servers?

A. No.

Q. Was anyone else present for this discussion with Craig?

A. No.

Q. And other than what you have told me, can you be any more specific or do you recall anything else that was discussed at your meeting with Craig?

A. Not specifically.

Q. And when did you meet with Silvia?

A. Approximately the same time, the same time period as I met with Craig.

Q. Do you know how long that meeting took place?

A. The actual meeting itself?

23

Q. Yes, sir.

A. Two minutes.

Q. And what was discussed during that meeting?

A. Again, procedures of how we making sure that we are following procedures in the restaurant.

Q. And did that discussion concern the manner in which servers are paid?

A. No.

Q. Was anyone else present for that meeting?

A. No.

Q. And when did the meeting with Chantelle Riha take place?

A. That was further back. I couldn't even hazard a guess.

Q. Was it within the last month?

A. No, further back.

Q. Okay.

A. Yeah, a little further back.

Q. Was anyone else present for that meeting?

A. No.

Q. How long did the meeting take place?

A. A few minutes.

Q. What was discussed?

24

A. The procedures, making sure, again, that we were following procedures.

Q. Whatever information you gathered from Craig, Silvia, and Chantelle, was this information you did not know before, or was it information you did know but you wanted to confirm it?

A. I believe I said it was confirming the information.

Q. So you weren't looking to, you know, learn information that you didn't already know?

A. No.

Q. Have we now covered all the persons that you consulted with to prepare for today's deposition?

A. Yes.

Q. We talked about how you are an owner of the Original House of Pancakes.

A. The Original Pancake House.

Q. I apologize. The Original Pancake House.

A. Thank you.

Q. Please correct me if I make that mistake again, because I very well may.

You are an owner of the Original Pancake House. What other role, if any, do you play in

**25**

Q. connection with that entity?

A. I am an officer of the corporation. Secretary.

Q. Has that been for the last approximately ten years?

A. Since I purchased it, yes.

Q. And your wife is the president?

A. She is.

Q. And there are no other officers or directors?

A. No.

Q. And do you play an active role in the management of the Original Pancake House?

A. Yes.

Q. And describe your managerial duties.

A. It's kind of vague. I oversee the operation of the restaurant.

Q. Sure. Sure. No, that's fair. A lot of honor owners take a sort of passive role, and they may own something, but they never actually visit their place, they have other people that do it for them. I'm just wondering if you are more of a hands-on guy or more of, you know, a silent owner.

A. I'm a hands-on.

**26**

Q. So do you keep regular hours in the restaurant?

A. No.

Q. Does your wife play a hands-on role as well?

A. She does.

Q. Have you sort of divided the responsibilities of the restaurant between you two?

A. Not officially, no.

Q. Well, is there sort of an unofficial or informal division of responsibilities?

A. No, we both oversee similar responsibilities.

Q. Okay. Fair enough.

Before owning the Original Pancake House, did you have any experience in the restaurant industry?

A. I worked as a server.

Q. When was that?

A. Out of college, early '90s.

Q. A long time ago.

Any other owner or managerial experience in the restaurant industry before becoming the owner of the Original Pancake House?

**27**

A. I worked for the previous owner of #7 Zimmie's, Inc., for a period of time.

Q. Okay. Who was that person?

A. Don LaRoche.

Q. Is he still around, by any chance?

A. What do you mean by around?

Q. I mean, has he passed away?

A. No, he hasn't.

Q. And he has no connection with this entity nowadays, right?

A. No.

Q. What did you do for Mr. LaRoche?

A. I was a restaurant manager.

Q. For this restaurant at this location?

A. No.

Q. For what? You said you were a restaurant manager. I am trying to get a correct --

A. For a different restaurant that he owned.

Q. Got it. What was the name of that restaurant?

A. It was Original Pancake House.

Q. Okay. Different location?

A. Yes.

**28**

Q. Where was that located?

A. In Hyde Park.

Q. And how long were you the manager of that restaurant?

A. It would be a year. I don't know the exact dates.

Q. And was that your only other managerial experience with a restaurant before taking an ownership interest in the Original Pancake House we're talking about today?

A. Yes.

Q. Was he your father-in-law?

A. He is.

Q. All right. And do you know if that restaurant in Hyde Park still exists?

A. It does.

Q. And I take it 7 Zimmie's has no affiliation with that restaurant?

A. Correct.

Q. And neither do you?

A. No.

Q. Does your wife?

A. I'm sorry?

Q. Does your wife have any affiliation with

29

that restaurant?

MR. CONNEALY: Yeah, I'm not sure if we can go -- can we go off the record here?

MR. ZOURAS: Sure.

(Whereupon, a discussion was had off the record.)

(Whereupon, the record was read by the reporter as requested.)

BY THE WITNESS:

A. Yes.

BY MR. ZOURAS:

Q. What is that affiliation?

A. She's an owner.

Q. All right. At the Original Pancake House, by chance do you use a company e-mail?

A. Yes.

Q. And does your wife have an e-mail account, a company e-mail account?

A. Yes.

Q. Do your three managers as well?

A. They do.

Q. How about the two supervisors?

A. They do.

Q. Does anyone else have a company e-mail

30

address?

A. That we discussed or --

Q. Other than who we have discussed?

A. No, it's just management and supervisors and us.

Q. And we have covered all those folks, yes?

A. Yes.

Q. Who is Diego Bellandi, B-E-L-L-A-N-D-I?

A. He was a manager that is no longer with the company.

Q. Okay. When did he leave the company?

A. I cannot give you an exact date.

Q. Can you give me your best estimate?

A. About three years ago.

Q. And Diego was a manager as opposed to a supervisor?

A. Correct.

Q. Have you signed any declarations or affidavits in this case?

A. I guess I'm not sure what the definition of declaration or affidavit is.

Q. Sure. Fair enough. So a declaration or an affidavit would be a series of statements under oath that you would have made maybe about some of

31

the allegations in this case, some of the defenses, some of the facts, and so forth.

Now, I will tell you, you have signed off on interrogatory answers. That's different, and I am leaving that to the side. I am talking about a separate document where it is called a declaration or an affidavit, and it looks like what I've just described.

A. No, not that I'm aware of.

Q. Have we now discussed all of the individuals who report directly to you at the Original Pancake House?

A. I believe so.

Q. We talked before about how you as an owner and as somebody who has taken hands-on managerial responsibilities play an active role in a business. Is that fair to say?

A. Yes.

Q. Do you have the authority to establish wage and hour policy for servers at the Original Pancake House?

A. Yes.

Q. Does anyone else have that authority?

A. My wife.

32

Q. Anyone else?

A. No.

Q. And at any time, did you establish wage and hour policy which would apply to servers at your restaurant?

A. The wage and hour policy was in place when I purchased the restaurants.

Q. Back in 2003?

A. Correct.

Q. All right. So are you testifying that you would have continued the wage and hour policies that were already in effect at that time?

A. Yes.

Q. Was there a conscious decision made to do that, or did it just sort of happen by virtue of you taking over an ownership interest in this restaurant?

A. The policy was reviewed, so yes, I would say it was a conscious effort, decision.

Q. So you would have purchased the restaurant in 2003 with your wife, you would have sat down, you would have reviewed the wage and hour policies and made a decision at that time to continue them, yes?

33

A. Yes.

Q. Did you consult with anyone else at that time about the wage and hour policies?

A. These paychecks with the payroll company, they were involved in the process. Off the top of my head, that's all I can remember.

Q. You don't remember consulting with any legal counsel at that time?

A. Not that I recall.

Q. And you don't remember consulting with any federal or state Department of Labor?

A. No.

Q. You mentioned Paychex.

Was there a contact person at Paychex you would have had help you review the wage and hour policies when you first took ownership of this entity?

A. That's going back too many years. I don't recall.

Q. Do you currently have a contact person at Paychex?

A. We have a rep, yes.

Q. Who is that?

A. I can't give you that information.

34

I don't know.

Q. You could figure it out, but you don't --

A. I have -- yes, I have it. I just don't have it, yes, today.

Q. Fair enough. Whoever that person is, has it been the same person for a number of years?

A. I don't believe so. I believe there's been a few recently, that it's changed.

Q. Understood. Well, let's go back to 2003 when you first undertook the review of the wage and hour policies. I think you said your wife and yourself reviewed them. You had the help of the payroll company Paychex to do that.

Do you remember what specific role Paychex would have played in that review?

A. It would have had to do with putting together the payroll, the physical check to make sure all the information was on there correctly.

Q. Got it.

A. So the information --

Q. You are talking about the information on the pay stub?

A. On the pay stub, yes.

Q. All right. I got it.

35

I take it that when you took ownership interests of the Original Pancake House in 2003, there would have been some written policies regarding how servers are paid?

A. I guess I'm not -- I don't understand the question. What do you mean by how they were paid?

Q. Well, a lot of companies, including restaurants, for example, might have a handbook, and they might have a written statement in the handbook regarding the amount a server might be paid and other information about their pay and whether it's pursuant to a tip credit and what the tip sharing policy is, and so forth. I'm just wondering if any document like that existed when you bought the place in 2003.

A. There was a handbook in place. It was much briefer. I don't recall what information was in there.

Q. You said it was briefer than the version you have now?

A. Correct.

Q. The version that you use today was created when, if you know?

36

A. I don't recall off the top of my head.

MR. CONNEALY: You can use these.

BY MR. ZOURAS:

Q. Yeah, once again, for all of these questions --

A. Can I take a look at the documents?

Q. Always. If you need to refer to Exhibit 1 to answer any of these questions, you have total freedom to do that.

A. I don't recall without looking at that. The current version was updated in April of 2009.

Q. Thank you. All right.

And who created that updated version?

A. Myself and my wife.

Q. Anyone else?

A. It was reviewed by our insurance broker, I guess.

Q. Do you know who company that would have been?

A. It was Horton. I don't know the exact format.

Q. And that would have been sometime shortly before April of 2009?

A. Yeah, it took a little bit of doing.

37

Yeah, before 2009, around there.

Q. Was the handbook reviewed by legal counsel, by any chance?

A. I don't recall if they had something to do with legal.

Q. If it was reviewed by legal counsel, it would have been Horton that did that, yes?

A. Yes.

Q. Well, getting back to the wage and hour policies that were in effect in 2003 that you elected to continue, do you remember how servers were paid at that time?

A. What do you mean by how they were paid?

Q. Sure. Were they paid hourly?

A. Yes.

Q. Do you remember the rate of pay, by any chance?

A. In 2003, no.

Q. Were they paid -- well, first of all, do you know what a tip credit means?

A. Yes.

Q. Were they paid pursuant to a tip credit at that time?

A. Yes.

38

Q. Were they paid pursuant to the State Minimum Wage tip credits at that time?

A. I don't understand what that means.

Q. Let me ask you if you are aware of whether or not Illinois has a regulation requiring employees who are paid a tip credit to be paid a certain minimum amount.

A. Yes.

Q. All right. And do you know if these servers were paid that minimum amount when you took over the restaurant in 2003?

A. Yes.

Q. You know they were?

A. Yes.

Q. How could you verify that?

A. I'm sorry?

Q. You know they were paid the state tip credit minimum wage in 2003, yes?

A. Yes.

Q. And I am just asking you how you know that.

A. I did the calculation.

Q. Back in 2003?

A. Yes.

39

Q. Okay. Great. Did that ever change?

A. Did what change?

Q. Was there ever a point when the Original Pancake House did not pay servers the state tip credit minimum wage?

A. No, not that I'm aware of.

Q. So as far as you are concerned, even throughout the time period that we are going to discuss today, the Original Pancake House always paid the state tip credit minimum wage?

A. I guess I don't understand the question. I mean, did I comply with the -- do I believe I complied with the state requirements or --

Q. That's -- I'm asking a slightly different question.

A. Yeah, that's what I thought. So I was trying to answer.

Q. No, that's fair. So you do recognize that the state has a certain amount --

A. Yes.

Q. -- that they require all employers of tipped employees to pay the tipped employees, yes?

A. Yes.

Q. Right. And I'm just wondering if at any

40

time, for whatever reason -- and I understand you may have a reason for it, but at any time were servers at your restaurant paid less than that state-required amount?

A. Yeah, I think you might have to give me an example here of -- I don't understand the question.

Q. Do you know currently what the state tip credit minimum wage is?

A. It's been 40 percent of minimum wage.

Q. I'm sorry. Say that again?

A. The maximum tip credit allowable is 40 percent of the minimum wage.

Q. Okay. I am going to represent to you that currently in 2013 the amount is.95 an hour. Does that sound about right to you?

A. Yes.

Q. All right. By any chance, do you know how long it has been 4.95 an hour?

A. Since the last time they raised minimum wage.

Q. That sounds about right, and I am going to represent to you that that has been the case for 2013, 2012, and 2011. Does that sound about right

41

to you?

A. That sounds about right.

Q. Now, were servers paid an hourly wage of $4.95 in 2011?

A. An effective minimum wage of 4.95, yes.

Q. Well, how about an actual one?

A. I don't --

Q. You seem to be drawing a distinction between a minimum wage and an effective minute wage.

What is your definition of an effective minimum wage?

A. Well, servers earn a cash wage as well as a benefit.

Q. I'm sorry, as well as what?

A. A benefit.

Q. A benefit?

A. Yes.

Q. Okay. And has that been true since 2003?

A. Yes.

Q. And you told me before, I think, that you don't know what the cash wage would have been for servers in 2003, correct?

A. The cash wage would have been 60 percent

42

of the minimum wage less 10 cents.

Q. And that's what it was in 2003?

A. I believe so.

Q. And what you told me has been the case continuously up to the present day?

A. Correct.

Q. And we will get more into this in a bit, but why is it, if you know, that there is a cash wage minus 10 percent -- I'm sorry, minus 10 cents?

A. Why is -- what's the question?

Q. Well, you just told me that servers are paid a certain way?

A. Yes.

Q. They are paid -- it's 40 percent off the state minimum wage minus 10 cents, yes?

A. They are paid 60 percent of the minimum.

Q. Another way of saying it is they are paid 60 percent of the state minimum wage minus 10 cents?

A. Correct.

Q. All right. And why is it that they are paid that way, if you know?

A. We take a meal credit for employee meals.

43

Q. The 10 cents, I take it, is due to the meal credit, yes?

A. Yes correct.

Q. And that has been the case, as far as you know, since at least 2003?

A. Yes.

Q. If not before, yes?

A. Yes.

Q. All right. And when you took over the restaurant in 2003, you were aware that this is how servers were paid?

A. Yes.

Q. And at that time, what did you do to confirm that that pay plan complied with the legal requirements, if anything?

A. Well, we met members of the national restaurant association, and they had publications on this.

Q. So you would have read articles about this?

A. Yes.

Q. By any chance, did you keep any of them?

A. No.

Q. Other than reading articles, did you do

44

anything else to confirm that that manner of pay was legally compliant in 2003?

A. Not that I'm aware of.

Q. Okay. Before you received notice of this lawsuit, did you do anything else to confirm that that method of pay was legally compliant, other than what you have already told me?

A. I believe it was discussed with Paychex.

Q. Okay.

A. We switched over -- let's see. We switched over to a new reporting system, and I believe the paycheck layout changed a tad bit, and we went through the whole thing as to how to make sure all the information was contained on the check.

Q. And approximately when did this happen?

A. 2010, beginning of 2010.

Q. And is it your testimony that at that time you had a discussion with somebody at Paychex about whether or not the pay plan for servers we just discussed was legally compliant?

A. I can't say that I recall the exact conversation. I would say that -- I don't think the question ever came up whether it was legal or

45

not, but they did say that that's how they did it for other companies.

Q. Fair enough. When you say they, you are referring to Paychex?

A. Paychex, yes.

Q. Is there a specific individual you remember who told you that?

A. I don't recall if the -- I'm trying to think if we have that information somewhere. I'm not sure if I have that information.

Q. Was this a verbal thing, or was it in writing?

A. It was -- we had a meeting, and we were physically setting up the system, so it was part of the meeting.

Q. But it wasn't memorialized in a document or an e-mail or anything like that?

A. Not that I'm aware of. I think it might have been mentioned in an e-mail, but I can't say for sure.

Q. To the extent it was, you don't have a copy of that e-mail today, as far as you know?

A. Not today I don't.

Q. This meeting took place at Paychex?

46

A. No, in my office.

Q. The same one we talked about before?

A. Which office?

Q. Well, actually, I guess we didn't talk about it.

Do you have an office at the Original Pancake House?

A. Do I have an office there?

Q. Yes.

A. There is an office there for the operation of the restaurant.

Q. Oh. Okay. Well, where did the meeting with Paychex take place? You says it was in an office?

A. I have a separate office.

Q. Okay. Where is that?

A. It's in Orland Park.

Q. When you say you, is that an Original Pancake House office or an office for some other reason?

A. It's -- it's not an Original Pancake House office.

Q. All right. It's for some other businesses you may conduct out of there?

47

A. Correct.

Q. Yes?

The person from Paychex that was at that meeting -- by the way, who was at the meeting other than person from Paychex?

A. Probably my office manager.

Q. And who was that?

A. Her name's Chris Byrne.

Q. Is that a boy or a girl?

A. It's a woman.

Q. Is she still with the company?

A. She is.

Q. Is she still the office manager?

A. I'm sorry?

Q. Is she still the --

A. Which company? I'm sorry. Which company are you referring to?

Q. Well, is there some other company that does business out of this office we are talking about?

A. Yes.

Q. What is that other company --

A. She's with them.

Q. All right. And is there a name to the

48

other company?

A. Yes.

Q. What is it?

A. OPH Management.

Q. Is she still the office manager for OPH Management?

A. She is. She is.

Q. And I am going to venture to guess that the OPH probably stands for Original Pancake House; is that true?

A. No, it's just OPH.

Q. Okay. Who else was present for the meeting?

A. I believe that's it. I don't -- it happened a while ago. I don't know --

Q. You don't know if your wife may have been there?

A. She may have been. I don't know.

Q. The person from Paychex, do you remember their title by any chance?

A. No.

Q. And when it came to the discussion about the pay plan for servers that we have talked about, that person would have said, "Hey, here are some

49

other restaurants. Do it." Correct?

A. Correct.

Q. Anything else that you remember about what they would have said about the pay plan, if anything?

A. No, not that I recall.

Q. Did they mention the names of the other restaurants?

A. No.

Q. Are you personally aware of other restaurants that do it this way?

A. I'm aware of the restaurants that have done it this way. I'm not sure if they currently do it this way.

Q. We talked before about how you determined this pay plan was legally compliant by checking articles for the National Restaurant Association?

A. Yes.

Q. We have covered the discussions with Paychex.

Have we covered all of the ways you used to determine whether the pay plan was legally compliant before the lawsuit was filed?

A. Let's see. I believe I conferred with

50

my accountant. Sure, I've looked up the law, I'm not sure what it's called, whether it's the administrative code or whatever that would be, the administrative code.

Q. Okay. Did you look it up --

A. Online.

Q. On the internet?

A. Yes.

Q. All right. And you did that personally?

A. Yes.

Q. You didn't have anybody else do it for you? Okay.

You mentioned an accountant. Is that Mr. Burt Bowen?

A. Correct.

Q. And when would you have consulted Mr. Bowen about the pay plan for servers?

A. I don't recall exactly.

Q. And it was before the filing of the lawsuit, of course, right?

A. Yes, before. Sure.

Q. And was this at a meeting? Was it over the phone? Was it seem e-mails? Was it something else?

51

A. Oh, I'm sure it was over the phone.

Q. And you would have asked him whether or not he felt the pay plan for servers was legally compliant?

A. Correct.

Q. And he told you he believed it was?

A. Yes.

Q. Do you remember any other details about that conversation?

A. No.

Q. Is Mr. Bowen an attorney, as far as you know?

A. I don't know.

Q. Did Mr. Bowen indicate to you how he knew that the pay plan was legally compliant?

A. No, he did not.

Q. Have we now covered all of the methods you used to determine whether the pay plan for servers was compliant before the filing of the lawsuit?

A. I believe so.

Q. Is it fair to say that only you and your wife have the authority to change the pay plan for servers?

52

A. Yes.

Q. My next questions are going to concern the timeframe from 2009 to the present. So unless I tell you otherwise, that's generally speaking the time we are talking about.

A. Okay.

Q. How are servers notified of their pay plan when they were first hired at the Original Pancake House?

A. That they were going to be paid -- I guess I don't understand the question fully.

Q. Well, we talked before about how there is a specific pay plan in place for servers that has been in place for about ten years, yes?

A. Are you referring to the tip credit?

Q. Exactly.

A. Yes.

Q. So it's 60 percent minus 10 cents?

A. Yes.

Q. Like we talked about before.

So you would agree with me that that is a concept that is conveyed to the servers when they are first hired, yes?

A. Yes.

53

Q. All right. And I am just asking if you know how that is conveyed to the servers.

A. There was a change in that time period, I believe. I think the federal government came out with some new requirements that you -- I don't recall the date. We had to notify -- a requirement to notify the servers that they were taking a tip credit.

Prior to that date, whatever date that was, I don't recall, it was done verbally. After that date, we have a notification form that we asked them to sign to notify them that the -- inform them about the tip credit.

Q. Got it.

So if I understand you correctly, sometime within the last approximately four years you believe there was a change or a revision to the law requiring employers of tipped employees to notify them in writing about the tip credit?

A. Not that you had to notify them in writing but that you had to notify them. There was a requirement. I think the requirement's only verbal, but we did the written process so we could have the document to -- in case it ever came up.

54

Q. Fair enough. And do you know approximately when that would have taken place?

A. I can't -- two years ago, year and a half, two years.

Q. Approximately?

A. Approximately. Yeah, I don't know exactly.

Q. And after that point, whatever that point would have been, you began providing written notice and getting the servers' signature on that notice? Is that fair to say?

A. Yes.

Q. Before that time, it was all done verbally?

A. Correct.

Q. I am going to show you what we will mark as Exhibit 2.

(Whereupon, Sczurek Exhibit 2 was marked for identification.)

BY MR. ZOURAS:

Q. I have shown you what has been marked as Exhibit 2. Do you recognize this document?

A. Yes.

Q. What is this document?

55

A. This is a notification sheet we ask our servers to -- we give it to our servers after we explain it to them and ask them to sign it.

Q. Is this the written notification that you just described me a couple moments ago?

A. That's what I was referring to, yes.

Q. Is this the only written notification you are aware of that would have advised servers about the tip credit policy at the Original Pancake House?

A. No, it's done verbally, but this is just an addition.

Q. My question was is it the only written one.

A. Oh, I'm sorry. Yes.

Q. And who would have handed this document out -- well, strike that.

Is this document provided to brand-new servers?

A. Yes.

Q. And was it also provided to servers that had already been employed by the Original Pancake House before this date?

A. Anybody that was still working for the

56

business, yes.

Q. As a server would have gotten this?

A. As a server, yes.

Q. So it would have been anyone working as a server before this time and any new ones who were employed afterwards?

A. Correct.

Q. And who would have been responsible for handing out this document to the servers?

A. The manager.

Q. And that would have been any of the three managers we talked about before?

A. I'm not sure the managers' hire dates, so I'm not sure if they were acting as managers then. So I don't know.

Q. But certainly any one of those managers would have had the authority to hand out a document like this?

A. Correct.

Q. And did you personally hand out these documents, by any chance?

A. I don't recall. I may have.

Q. Okay. In April of 2012, does that sound like the approximate time when you believe this

57

revision of the law may have taken place?

A. I believe so.

Q. So how did you learn of that revision or change in the law?

A. I believe the National Restaurant Association sent out a few updates from them.

Q. You received periodic updates from that association?

A. Yes.

Q. I take it you have been a member of that association for a long time?

A. Yes.

Q. Over ten years?

A. Well, the restaurant has, yes.

Q. Fair enough. And how do you receive these notifications? Are they --

A. E-mails.

Q. E-mails? How often do you get them?

A. I don't really pay attention to see if there is a rhyme or reason to it. Maybe weekly.

Q. Did you save a copy of whatever e-mail you would have received that notified you of this change in the law?

A. It's possible, but I'm not sure.

58

Q. Is that something you could look for?

A. I could.

Q. Now, you told me before that the pay plan for servers consists of a cash wage and a benefit, correct?

A. Yes.

Q. And that was true during the last four years?

A. Yes.

Q. Now, on Exhibit 2, can you show me where it explains that the servers are getting a cash wage plus a benefit, if it's on here at all?

A. Well, this just describes the cash portion of it.

Q. So would you agree with me that this document?

A. Exhibit 2, does not talk about the additional meal credit benefit that the servers get. There is no -- the words meal benefit do not show up on this document.

Q. All right. And no such language appears in any other written materials handed out to the servers. Is that fair to say?

A. I don't understand the question.

59

MR. ZOURAS: Can you restate the question.

(Whereupon, the record was read by the reporter as requested.)

BY THE WITNESS:

A. Okay. What language and what material are you referring to?

BY MR. ZOURAS:

Q. Well, I am now talking about the information that they are receiving a benefit on top of their cash wage. We have already talked about what that benefit is a little bit. It's a meal credit, yes?

A. All right. Yes.

Q. So I'm just asking whether or not the restaurant advises servers that they are getting a meal benefit in addition to a cash wage in any written materials that you are aware of.

A. Not in the written, but verbally, yes.

Q. And how is it you know they are provided that information verbally?

A. It's part of the training process.

Q. Do all the servers undergo the same training process?

A. Essentially.

60

Q. Okay. And if we wanted to know what that training process consists of, is there a written document we could consult?

A. I guess -- what are you looking for, like a training manual, or what -- let's see. We do have various documents that assist the trainer with training.

Q. What are those documents called?

A. They have several different names. Off the top of my head?

Q. Yes, sir. And, again, I will --

A. There's an abbreviation sheet, there's apportioning sheet, order of service sheet. That's -- off the top of my head, that's all I can remember. I think there are more though.

Q. You mentioned an abbreviation sheet, a point of sale sheet?

A. Apportioning sheet.

Q. Oh, apportioning sheet?

A. Apportioning, yes, so they serve, food so it describes what kind of portions.

Q. And a POS sheet, I suspect, has to do with point of sale?

A. No, it's not. It's a POS. I don't

**61**

believe I said --

MR. CONNEALY: Can we have that read back.

MR. ZOURAS: We can. I thought I heard POS, but I could be wrong.

BY THE WITNESS:

A. I'm sorry. Order of service.

BY MR. ZOURAS:

Q. Order of service. Got it.

A. Yes, which describes when you go to a table, your procedure and what you use and that type of thing.

Q. Sure. All right. So these are sheets that a trainer might use to help them train a new server?

A. Correct.

Q. And where are these sheets maintained?

A. At the restaurant.

Q. On a computer?

A. At the -- let's see. No, they are hard copies.

Q. And do any of those written training materials, to the best of your knowledge, remind the trainer to tell the servers, "Hey, here's how you are going to get paid, you are going to get a

**62**

cash wage pluses a benefit, and here is the formula for it," and it's exactly what you told me before?

A. I believe there is a checklist that has that. I would have to verify that, but I believe that there is.

Q. And is it just called a trainer check list?

A. I'm not even sure if it has a title.

Q. Okay.

A. I haven't looked at it.

Q. And it sounds like you are not positive if that information is on there, but it may be?

A. Yes.

MR. ZOURAS: And, Bob, admittedly, I don't know if that has been produced. If it hasn't, we can make a request for it.

MR. CONNEALY: Yeah, I mean, I think that we have produced -- I guess we could have this off the record.

MR. ZOURAS: Sure.

(Whereupon, a discussion was had off the record.)

BY MR. ZOURAS:

Q. Who does the training for the servers at

**63**

the restaurant?

A. The manager is involved as well as we usually have a server who also does the training, somebody that's been there for a while.

Q. A more experienced server?

A. Yes.

Q. And has that been pretty consistent over the last few years?

A. Yes.

Q. And you say a manager, we are talking about, assuming they were there, one of the three persons we mentioned before?

A. Yes.

Q. And it also could have been Diego, I take it, if he were still around?

A. Yes.

Q. And do you do any of the training?

A. There's continuous training, so yes, I mean, not always when they're first hired, but I do train. I mean, training never stops.

Q. Sure. So if you are at the restaurant and you happen to see a way you can improve how a server does something, you will certainly mention it to them, right?

**64**

A. Sometime sometimes. I usually go through the manager though.

Q. Fair enough. All right. But you don't do any of the actual training for new hire servers, correct?

A. If you're asking have I ever done it, yes, I have.

Q. That's not your general typical responsibility; is that fair?

A. I don't do it a lot, but do I take responsibility to do it if it needs to be done, yes.

Q. Fair enough. Okay.

A. Just like I'll mop floors, and it's --

Q. Whatever needs to be done. Fair enough. So if we were to summarize, managers are generally responsible for training the servers, at least new hires, but if for whatever reason they can't, there's a need to do it, nobody else is available, you are going do it, and sometimes you have done it, fair?

A. Yes.

Q. All right. Now, leaving aside the times you have done it, have you ever observed your

65

managers train new hire servers?

A. Yes.

Q. How many times in the last four years?

A. I couldn't put a number to it. Many.

Q. I mean, is it hundreds, dozens, ten, two?

A. Tens.

Q. And what does the initial training process consist of?

A. There's the orientation process where it's a general review of the restaurant, how it operates. I talk about pay, how often we get paid, where do we get paid, so, you know, all the paperwork stuff, the W-2s -- I mean the W-4s, I-9s, discuss employee meals, breaks. That's kind of the orientation period, and then it goes into the job-specific training.

Q. Now, servers generally have the same job, right?

A. Are there different server positions? Is that what you are asking?

Q. Well, you said there is job-specific training after the orientation, and my questions have really been focused on the servers.

A. Oh, if we're just talking about servers,

66

then it's yes, server training.

Q. So the orientation process would take approximately how long?

A. A couple hours typically.

Q. Are more than one server trained at the same time or -- strike that.

Does more than one server go through the orientation process at the same time?

A. I can't say that's never happened, but it would be very rare.

Q. Typically, it's a one-person thing?

A. It's one person, yes.

Q. So they go through the orientation, and then they go through job-specific training, in this case job-specific training for servers, yes?

A. Yes.

Q. And what does that process consist of?

A. We've got menu items, abbreviations, how to ring things into the computer system, order of service, how to serve a table, how to clean plates, cleaning side work.

Q. And that process takes approximately how long?

A. Depends on a server, but five days.

67

Five shifts I should say.

Q. And how are servers paid during the orientation process?

A. They are not earning tips, they are paid minimum wage, and if they advance to the point where they started earning tips, then they take the tip.

Q. And when you say they get the minimum wage, is that minimum wage minus 10 cents?

A. Yes.

Q. And do you know if you trained or observed training or the orientation of Nicole D'Agostino and Chelsea Schneider?

A. I can't say if I did or didn't.

Q. Would you have any records you could consult which could tell us that one way or another?

A. No.

Q. Do you happen to know which manager was responsible for the training of either of those individuals or the orientation of those individuals?

A. Not off the top of my head. I couldn't tell you who it was.

68

Q. And you don't have any records which could tell us?

A. Not definitively, no.

Q. You recognize that those two individuals were employed at one time by the Original Pancake House as servers, yes?

A. Yes.

Q. And by any chance, have you asked any of your managers whether they conducted the orientation for Ms. D'Agostino or Ms. Schneider?

A. Did not ask them that question.

Q. Is it fair to say that the same manager who conducts the orientation also conducts the job-specific training?

A. The job-specific training is typically done by a server.

Q. And that would be the more experienced server we talked about before?

A. Correct.

Q. So really the manager's role is to conduct the orientation?

A. Yes.

Q. We have already talked about that.

The orientation would include handing out

69

paperwork such as what we talked about, Exhibit 2?

A. Yes.

Q. Are they also given the handbook at that time?

A. Yes.

Q. And they are probably given tax forms, things of that nature, yes?

A. Tax forms, like --

Q. Well, what other paperwork are the servers given during the orientation?

A. Like I said, W-4, I-9.

Q. Okay. A tax form.

A. Okay.

Q. Anything else?

A. Off the top of my head, I can't say.

Q. Is Exhibit 2 the only document other than the tax forms the servers are asked to sign?

A. No, there's a document that they are asked to sign saying they have read the handbook. Let's see. It's -- if they read and specifically understood the attendance policy. Yeah, I'm going from memory. That's -- I mean, I could go on about it but off the top of my head, that's what I recall.

70

Q. And maybe if Exhibit 1 could help you to refresh your recollection, you are free to use that at any time.

A. Yeah, I don't remember right now.

Q. That's fine. Typically, how many servers does the restaurant keep on staff at any given time?

A. It varies through the year based on how busy we are. On average, I'm guessing, 12.

Q. Is that your best estimate?

A. At this point in time, yes.

Q. What is the highest it has been in the last four years?

A. With seasonal help? Would that include seasonal help?

Q. Anybody that would be a server?

A. A server?

Q. Sure.

A. Fifteen, 16.

Q. All right. So is it fair to say that the low would be as low as maybe 10 but as high as 15 or 16 at a given time, give or take?

A. It's possible.

Q. I will show you what we will mark as

71

Deposition Exhibit 3.

(Whereupon, Sczurek Exhibit 3 was marked for identification.)

BY MR. ZOURAS:

Q. Do you recognize that document?

A. Yes.

Q. What is that document?

A. Looks to be a list of employees that worked in the server position going back to approximately, I don't know, 2009, into 2010.

Q. Did you prepare this list?

A. Yes.

Q. Where did you get the information to prepare this list?

A. Payroll records.

Q. That you maintain?

A. Yes.

Q. There is a list for occupation. Some of them say Server, and some say Host/Server. What is the purpose of the designation host/server?

A. I believe the request was anybody that worked in a server position and included people who worked in multiple positions, which included

72

server.

Q. Is it that they are simultaneously employed as both a host and server?

A. Some people will hold multiple jobs, yes.

Q. So, for example, the very first time this happens, we have an entry of Avilis, A-V-I-L-I-S, do you see that?

A. Uh-huh.

Q. Is she currently employed; do you know?

A. Off the top of my head, I don't know.

Q. In any event, do you know if she on some days does host duties versus server duties, or on the same day she might be a host or a server? I'm trying to figure out how this works.

A. Oh, no, it's -- they work a shift. It's either a host or a server.

Q. But in a given week, they may be a host one day and a server the next?

A. Yes.

Q. Are they paid differently if they are a host?

A. Yes.

Q. How are they paid differently?

73

A. There is no tip credit.

Q. They are at State Minimum Wage?

A. Well, a wage, at least minimum wage, sometimes -- typically it's more.

Q. The host, when they perform host duties, it's typically more than a server wage?

A. Yeah, in that location.

Q. Okay. So do the hosts get a meal credit?

A. Yes.

Q. And is it the same 10-cent meal credit that servers get?

A. Yes.

Q. So whatever amount they get, be it the minimum wage, less than the minimum wage, more than the minimum wage, more than minimum wage, it's that amount, that cash wage, minus 10 cents?

A. Yes.

Q. And I take it that is true for other employees as well?

A. Yes.

Q. Is there somebody specifically designated as in charge of human resources at the Original Pancake House?

A. Lisa LaRoche-Sczurek, sir. Lisa

74

LaRoche, sir. I'm sorry.

Q. Your wife?

A. Yes.

Q. Do you undertake any responsibilities for human resource?

A. Occasionally.

Q. But she is kind of the point person?

A. Yes. I believe we lister her in the employee handbook as the contact person.

Q. So in other words, if somebody had a question or concern about, you know, their job environment, their pay, things of that nature, would you expect them to go directly to your wife?

A. Typically it's going to the manager first asking him if there's some simple question. They didn't get the answer they needed or didn't like, then they escalate it up to Lisa.

Q. Fair enough. Is there somebody designated at the Original Pancake House who is in charge of payroll?

A. In charge of payroll. I don't know what you mean by in charge of.

Q. Well, we talked about, for example, Paychex, the outside vendor you use. By the way,

75

is that the same vendor you have used for the last ten years to --

A. Yes.

Q. To process payroll?

A. Yes.

Q. Who primarily interacts with Paychex?

A. My office manager.

Q. And what is her last name?

A. Byrne.

Q. And is Ms. Byrne tasked with -- does she have a title, being in charge of payroll, you know, serving as the head of the payroll department, or anything along those lines?

A. No.

Q. And she is not employed, if I am not mistaken, by the Original Pancake House, correct?

A. No.

Q. And I think I know the answer to this, but your company doesn't have a formal legal department, I take it?

A. Formal legal department?

Q. Bigger companies typically have a legal department and they will have attorneys on staff that are employed?

76

A. Oh.

Q. You do not?

A. We do not.

Q. And I know you have counsel today. I am leaving that aside.

Did you have like a corporate counsel, somebody designated as your attorney or attorneys, before the filing of this lawsuit, by any chance?

A. No.

Q. Briefly getting back to Exhibit 2, which is the -- what do you call this document?

A. It's tip credit notification.

Q. Okay. The tip credit notification. You have produced these, I will just let you know, for the named Plaintiffs in this case.

Where did you get this document?

A. From the employee file.

Q. Who maintains the employee files?

A. I do.

Q. And would this be at the restaurant, your other office, or somewhere else?

A. My other office.

Q. Other than yourself and Ms. Byrne, who else has access to employee files and records for

77

the Original Pancake House?

A. My wife.

Q. Anybody else?

A. And we have two other office employees that just -- they are hired --

Q. And are they just administrative personnel? Okay.

And are the employee files maintained electronically, in paper form, or something else?

A. Paper form.

Q. I am going to show you what we will mark as Exhibit -- what are we on now, 4?

(Whereupon, Sczurek Exhibit 4 was marked for identification.)

BY MR. ZOURAS:

Q. And I will ask you if you recognize that document.

A. It looks to be a page from our employee handbook.

Q. And this would be the handbook you told me before that was revised in April of 2009, just like it says here?

A. Yes.

Q. And would you agree that this is the page

78

dealing with the company policy on meal breaks and rest periods?

A. Yes.

Q. As you sit here, do you know of any other written documents that discuss the meal and rest break policy of the Original Pancake House other than what I have shown you as Exhibit 4?

A. I don't recall if it's mentioned in other places in the handbook or not.

Q. All I can do is ask you what you remember or what you know.

A. Off the top of my head, no.

Q. You told me before that it was you and your wife who prepared the revised handbook?

A. Yes.

Q. Including this page, most likely?

A. Most likely.

Q. Do you know if you consulted any materials or anyone to help you prepare this meal and rest break policy that we see here on Exhibit 4?

A. Well, like I said, my insurance broker, through them, reviewed documents and such. I'm assuming they had given me this.

79

Q. Fair enough. Was this meal rest break policy accurate at the time it was prepared?

A. No, it was not.

Q. What was inaccurate about it?

A. This was based on the old -- the old manual system before we had the POS system in restaurants, there was a manual check system, and that's what this was based on.

Q. So before April 21, 2009, there was a manual system in place, and this policy was accurate when that system existed?

A. That's what this was based on, yes.

Q. And at what time did you get the new POS system?

A. I don't have the date off the top of my head. I --

Q. But whatever that date was, it was before April 21, 2009?

A. Yes.

Q. And this policy for whatever reason wasn't revised to reflect the new POS system that was installed?

A. Correct.

Q. And it still hasn't been revised, yes?

80

A. Correct.

Q. Is it fair to say that this policy does not reflect that as part of server pay they are going to receive a cash wage plus a benefit in the form of a meal credit?

A. One more time?

MR. ZOURAS: One more time.

(Whereupon, the record was read by the reporter as requested.)

BY THE WITNESS:

A. This section does not deal with employee meal credits.

BY MR. ZOURAS:

Q. Fair enough. Okay.

You told me before that it was inaccurate. What is inaccurate about it?

A. That the descriptions are like -- that it talks about giving a check to your manager and basically a manual system where you actually hand-write checks.

Q. So before the POS system was used, when an employee got a meal, they would write it out on some check of some kind and hand it to someone?

A. Correct.

81

Q. And this description is trying to reflect that process?

A. Correct.

Q. All right. So how was it done after the POS system was put in place?

A. The employee meal process is all programmed into the system.

Q. Okay.

A. Servers do it directly themselves, or actually any employee can do it directly themselves, but it takes a little bit of knowledge of how to use the POS system. So usually servers will help other people, or the managers will do it for the employees, or they would do it by themselves.

Q. And you will agree with me that currently there is no written description of how that process works?

A. No, like I said, it's not written, but it's programmed into -- it's hard-wired into our program or programmed into the computer system.

Q. So let's say I'm a server. Run me through how it works to get an employee meal at the restaurant.

82

A. All right. You have to log onto the system. You need a -- employees are -- servers, I should say, are designated a server number which they use to log on to the POS system.

Q. An individualized server number?

A. An individualized server number.

Q. How many digits?

A. For servers, it is three.

Q. So now they have logged into the system, the POS system?

A. But that's -- servers have those numbers, but for employee meals, the number we use is 444. So everybody together uses 444.

Q. Let me see if I understand you.

To gain access to the POS system, I as a server have an individualized code I input, and now I have access to the entire system?

A. Your personalized codes is access for taking care of paying customers.

Q. Okay. And I can ring them up and engage in transactions with the customers now?

A. Correct.

Q. Do I also use the POS system to clock in for purposes of pay?

83

A. You do.

Q. And is there a separate code I would use to do that?

A. It is the same number.

Q. And is there a button that I press to indicate that I have clocked in?

A. There is a -- you input your employee number, select your job code, and then hit clock in and punch in.

Q. And now I've clocked in?

A. Yes.

Q. For paper business?

A. Yes, it prints a little -- what's the option on it? I believe it prints a little sheet that says like you punched in at this time.

Q. Like a little receipt indicating this?

A. Yes.

Q. And I can keep that?

A. You can, yes.

Q. And I do the same thing essentially to clock out except there is probably a different button to do that?

A. It's a punch-out button.

Q. And it does punch in and punch out?

84

A. Correct. But the server process, there is a tip, that they have to claim their tips for the day also.

Q. At the end of the day?

A. When they clock out, yes, as part of that process.

Q. And they have to do that as well as clock out?

A. Correct.

Q. And as far as employee meals, if I understand you correctly, I as a server, after inputting my individualized number --

A. No.

Q. Well, bear with me. I put in my individualized personalized number just to get into the POS system. Right? No? Don't even have to do that?

A. Are you done? I want to make sure that you finish your question.

Q. No, I understand. And you are the expert.

A. Yes.

Q. So --

A. No, you do not punch in your

85

individualized personal number for an employee meal.

Q. But wouldn't I have to do that just to have access to the POS system to begin with?

A. You can also gain access using the employee meal number, which is 444.

Q. Understood. Okay.

So if I understand you, I can get an employee meal whether I have logged in or not for purposes of using the POS system for other reasons. In other words, if I am technically not on the clock, in theory, I could punch in to get a meal?

A. You could use it to get an employee meal, yes.

Q. All right. And although I have a personalized I.D. number, I am going to input 444 to indicate that I am getting an employee meal?

A. Correct.

Q. And this is all pursuant to the meal credit policy?

A. Yes, it's part of it. Yes. So it's programmed into the system, yes.

Q. The 444, is that just for servers, or is it for all employees?

86

A. All employees.

Q. And if I understand you, all employees can get a meal at your restaurant by typing in 444?

A. Any employee.

Q. Including managers?

A. Including managers.

Q. Including supervisors?

A. Including supervisors.

Q. Including you, perhaps?

A. Absolutely.

Q. Okay. And anybody else who is employed?

A. People on their day off can come in and get them.

Q. Understood. Okay. Got it.

A. It's a very liberal policy.

Q. Understood. All right. And so I input -- let's take it a step further.

As a server, I input the 444. I place the order at that time. I want an omelette. So do I press the code for omelette?

A. There are buttons, there is a menu that is predefined on there, and you select the items that you want.

Q. Yes.

87

A. And some things are -- some items are included in the employee meal program, some that they are discounted, they're a separate thing, but they are a discounted item.

Q. Some items are entirely free versus some items are discounted?

A. Yes.

Q. And there are separate let's call them employee menus for each, yes?

A. The system knows when you ring it in. It associates a price with that item.

Q. Or not?

A. Or not.

Q. How are the servers told which items are free and which ones are at a discount?

A. As you ring it up, it shows you right on there.

Q. So they learn about it after they have already rung its up?

A. As they ring, it pops up. If they don't want it, they can delete it. They can change the order.

Q. They can undo it if they want to?

A. Yes.

88

Q. Why is it that certain items are at a discount versus being entirely free?

A. Some -- primarily, there's a few items that it's -- they are premium items.

Q. They're more expensive items?

A. Steaks, they are very expensive, but most of the items I would say are because it's a very small restaurant, we have limited resources to cook the items.

An example would be an omelette, okay, we oven-bake our omelettes. We have one oven. It's very small, it's very difficult, it fills up, so we discourage that by having a price associated with it.

Q. Understood.

A. You could get the exact same food ingredients in an omelette, but you get it scrambled, and it it's free.

Q. Got it. Are any employee meals at full price?

A. Employee meals at full price?

Q. Uh-huh.

A. I mean, it's a discount. Yeah, some things are not discounted.

89

Q. Which ones are not discounted?

A. I could give some examples. I can't get through the whole list.

Q. Right. Some examples are fine. Sure.

A. I believe the apple pancake is full, the price. Steak entrees are full price.

Q. And these are for similar reasons. These are high-end items, I take it?

A. Yes, they take a long time, and it's mostly about the resources. We have limited resources too.

Q. I can understand that. Now, what we have been talking about, does it apply to drinks as well?

A. Let's see. Does what apply to drinks, I guess, is the question?

Q. Do employees get free or discounted drinks by typing in a 444 and then they will get coffee either free or discounted or whatever?

A. Yes, there are free drinks. I'm trying to think if there are any full-price drinks. There may be. Right off the top of my head, I can't think of any. But those are not wrong in the POS system. They are --

90

MR. CONNEALY: Just as a point of clarification, so were you saying for beverages that you have to put it in the system, or -- well, I just didn't want to get you confused, because I --

MR. ZOURAS: Yes, that's fine.

BY MR. ZOURAS:

Q. I'm not trying to trick you. I mean, we have a meal credit, and it's called meal credit literally, and I am just trying to see if it really is literal or if it includes beverages too.

A. Oh, absolutely it includes beverages.

Q. It does. Okay.

A. But we don't ring the beverages through the POS system. They are free to everybody. They are easily accessible. The things that are rung in the system are typically things that have to go through the kitchen.

Q. All right.

A. So we have to print something so it can be produced.

Q. So I am a server, and I want a Coke. I can get one. I can it for free. I haven't violated any policies, and I don't even have to put that in the POS system as a 444?

91

A. Exactly.

Q. And that is true for a number of other beverages as well?

A. Yes.

Q. And that may be true for other non-kitchen items probably like fruit, for example?

A. Some fruit, yes.

Q. That sort of thing. So the POS is for kitchen, things that have to be cooked. Is that fair to say?

A. Yes.

Q. Got it. All right. We have talked a lot about the meal credit. Let's say I am a server, and I say to you as my boss or a manager, or whoever, "I don't want the meal credit. I'd rather just have the tip credit, minimum wage, the full version of it, but I'm declining the meal credit."

Do I as a server have that option to do that?

A. Yes.

Q. Okay.

A. There are -- yes.

Q. Has anyone ever chosen to do that?

A. We've had people ask about the tip

92

credit, what it's for. Did somebody ever ask -- oh yeah, we had a -- I think it was a vegan or something along those lines that -- this was a while ago. She was concerned because apparently for whatever item, I'm not sure exactly what a vegan is, but a lot of the food items she didn't --

Q. They can't eat animal products, I think.

A. Yes. So she was concerned about it and felt that, you know, it wasn't fair or whatever. So we sat down with her and kind of reviewed the process with her, and then she felt just for the fact that she was able to get drinks, that there were several that she could drink or whatever, she wanted to be part of the program because it was cost-effective to do so.

So that's the only one that comes to mind of somebody that had even questioned, you know, getting out of it. And that's all I can think of.

Q. And I take it as a result of this meeting with this vegan, she began being paid the 4.95 an hour as opposed to the 4.85?

A. No, she chose to keep the meal credit.

Q. She chose to keep it anyway?

93

A. Yes. Oh, yes, just for the drinks, because she was able to get the drinks for free, so she decided that the amount she was paying was worth the benefit she was receiving.

Q. And you spoke to this person?

A. It was my wife.

Q. And do you know when this conversation would have taken place?

A. It was a bunch of years ago.

Q. And you weren't present for it?

A. I was not there.

Q. You are hearing this story as relayed to you by your wife?

A. Yes.

Q. Do you happen to know the vegan's name?

A. No, I don't know.

Q. Whoever it was, do you know if it was a male or female?

A. It was a female.

Q. And was she a server?

A. She was a server.

Q. Do you know the approximate timeframe she would have worked for the restaurant?

A. No.

94

Q. Does she still work there, if you know?

A. No.

Q. So getting back to my original question --

A. Yes.

Q. -- is it your testimony that somebody could go to you and say, "Hey, I don't want this meal credit, I'd rather just get the regular state minimum wage tip credit," and you would give it to them?

A. Yeah, it doesn't make any sense for -- I mean, I lose a tremendous amount of money for people using this program. Every time they order, I lose a lot of money. I wouldn't try to convince them otherwise. It doesn't make much sense.

Q. Whether it does or not, I'm just asking a simple question.

A. Yes. Yes.

Q. If for whatever reason -- I'm irrational, let's say. I'm a server. I've just been hired by your company. I tell you, "I don't want any meals here. I don't want any free meals. I don't even want any free drinks. I just want my extra 10 cents an hour." I come to you, and I go to a

95

manager or whoever, and I say, "Could I please have the extra 10 cents?"

Is it your testimony that you would then give a person that extra 10 cents in lieu of the meal credit program?

A. It has never happened, but yes. Yeah, it's -- I mean, I would save myself money, and it is easy enough to do. It's not a hard process by any stretch.

Q. In other words, if it happened tomorrow, you would be okay with what I just said?

A. Yes.

Q. But that has never happened, to the best of your knowledge, no one has ever come to you and asked you to do that?

A. Not to me, no. I don't know of any managers that have been approached. No.

Q. Do you know of any managers who have ever told a server, for example, during the orientation process or otherwise that, "Hey, you have a right to decline this, you don't have to have a meal credit, we will just give you the extra 10 cents"? Do you know of that ever happening?

A. Did they state it just like that, I

96

don't know.

Q. Not necessarily just like that, but paraphrasing it something to that effect, anything along those lines?

A. I don't know.

Q. And are you aware of any anything in writing that conveys that?

A. Conveys --

Q. The idea that the server can decline the -- we have been calling it the benefit, the meal credit, whatever it is, the 10 cents?

A. Yes. Well, it's such a huge benefit, most people accept it without any issues. They love it. It's a great, well liked, well loved benefit, often used.

Q. If I wanted to know how many times Nicole D'Agostino used this benefit, could you tell me?

A. Like an exact number, is that what you are asking for? No.

Q. Can you give me an approximate number?

A. Based on my research speaking with managers in the restaurant, I'd say on most days she worked, she used it.

Q. So the way you would tell me how many

97

meals Ms. D'Agostino consumed at your restaurant is by asking a manager who would tell you what they observed her eating at the restaurant. Is that fair to say?

A. I would ask a manager if they observed her eating, and they would have said yes, most days. And that's for Ms. D'Agostino. For Ms. Schneider, we specifically asked her. My wife asked her if she was in the system on a regular basis, and she said yes.

Q. Getting back to my original question about Ms. D'Agostino, you don't have any records which could tell us how many meals she would have consumed at the restaurant. Is that fair to say?

A. Specifically her, no.

Q. And you don't have any records which could tell us the cost of any of those meals, yes?

A. The cost of meals in general or --

Q. Of the meals that you say Ms. D'Agostino consumed?

A. Not specifically her, but as a general group, all my employees together, yes, we can.

Q. You could tell me as a group, and you have told me as a matter of fact -- we will get to

98

that in a second, but you have told me as a group, told us, how many meals and how much those meals cost on a group-wide basis.

In other words, you could tell me for all your employee, they have all consumed this number of meals, the meals cost this amount of money. You can run a report, either you can or your vendor can, that tells us that information, yes?

A. I can run a report that tells us what meals were consumed -- well, or, yes, that were rung under the 444 thing which were consumed by employees.

O. Including servers?

A. Including servers.

Q. Including everybody, managers, supervisors, you, anyone, yes?

A. Yes.

Q. All right. And getting back to my original question, though, you can't tell me how many meals Ms. D'Agostino consumed on any given day using any records, correct?

A. No.

Q. And I say given day. That's true for any time period, on a weekly basis, a yearly basis,

99

throughout her tenure, anything like that, correct?

A. I can't tell you exactly how many times she used it, but I can tell you that she has used it.

Q. And you are able to tell me that because you asked her managers, correct?

A. I asked managers, other employees, yes.

Q. And which managers told you that they witnessed Ms. D'Agostino eating meals?

A. Craig Arrigoni.

Q. Anybody else?

A. Sylvia Zermeno.

Q. Anyone else?

A. Well, that's the only two I have asked. I'm sure if I had asked anybody else, they would have probably given me the same answer.

Q. Well, I am not asking you what are sure of. I am asking you what you actually did.

You spoke to Craig and Silvia, and you asked them specifically, "Hey, did you see Ms. D'Agostino having meals"?

A. Yes.

Q. And did you have this conversation at the same time with both of them or separately?

100

A. Separately, I believe.

Q. And do you know the approximate timeframe these conversations would have taken place?

A. Shortly after I received notice, so December-ish of last year.

Q. Shortly after you received notice of the lawsuit?

A. Yes.

Q. And what was this, over the phone or in person?

A. In person.

Q. And you would have gone to, let's say, Craig and said, "Hey, Craig, did you see Ms. D'Agostino eating any meals on duty," and he told you yes?

A. That would have been part of the conversation, yes.

Q. Part of the conversation.

And how many meals did he tell you Ms. D'Agostino had eaten?

A. That she took most days that she worked.

Q. One meal a day?

A. How many times did she eat every day?

Q. Yes. Yes.

101

A. I didn't ask him.

Q. Did he indicate that she had the same meal, that she mixed it up, that she had breakfast, that she had lunch, any details like that?

A. I didn't ask.

Q. And he didn't volunteer the information?

A. I didn't ask.

Q. And he didn't volunteer it?

A. Not that I recall.

Q. Okay. Silvia, similar conversation?

A. Yes.

Q. Okay. And what did she tell you about the meals that Ms. D'Agostino ate?

A. I didn't ask specifically.

Q. She just told you that she had some meals?

A. Yes.

Q. No more details?

A. She may have answered and may have gone into some detail, but I don't recollect the exact conversation.

Q. Fair enough. Did you have a similar conversation regarding Ms. Schneider with these two?

102

A. I did.

Q. Similar answers?

A. Same answers.

Q. No more detail?

A. Not that I recall.

Q. Did you ask either Craig, Silvia, or any of the managers about meals consumed by any other specific individuals?

A. Let's see. I believe the conversation started -- all employees just in general started asking the question. So I would say I asked pretty much about everybody in general.

Q. And Craig and Silvia told you that everybody, all the servers, all take advantage of the meal credit program by eating the meals?

A. They didn't know of anybody who didn't take advantage of the meal credit.

Q. Do you know if Silvia or any other managers kept records of these meals?

A. On their own?

Q. Correct.

A. Outside of the restaurant?

Q. Do you know of anybody who did?

A. Sometimes they write their names on the

103

kitchen checks.

Q. Okay.

A. I'm not sure. They may.

Q. You didn't look for any of those --

A. No, I did not look for any.

Q. And do you know if they exist?

A. I am not sure.

Q. So just to kind of close this loop, the only records you would have about employee meals are the ones maintained on the POS system after an employee types in the 444 code?

A. I'm sorry. What was the question?

MR. ZOURAS: Can we read the question back.

THE WITNESS: And after when we are done with this question, I would like to take a break, if that's fine.

MR. ZOURAS: Yeah, that's fine.

(Whereupon, the record was read by the reporter as requested.)

BY THE WITNESS:

A. With the exception of the names on individual kitchen checks that are mentioned, I would say that's correct.

104

BY MR. ZOURAS:

Q. And you haven't located any of those kitchen checks?

A. I have not.

Q. And you don't know if they are maintained?

A. Not on a regular basis, but no.

MR. CONNEALY: So do you want to take a break?

MR. ZOURAS: Let's break. Can we talk about kind of our --

MR. CONNEALY: Timeframe?

MR. ZOURAS: Yeah. Sure.

MR. CONNEALY: We can go off the record.

MR. ZOURAS: We're off the record.

(Whereupon, a discussion was had off the record.)

BY MR. ZOURAS:

Q. Steve, you recognize you are still under oath, correct?

A. Yes.

Q. All right. We talked about the meal credit and the extra benefit the employees get a lot today. We talked about how that is 10 cents, correct?

105

A. 10 cents an hour.

Q. 10 cents an hour?

A. That's what we talk out of the payroll.

Q. And that applies to all the servers universally, correct?

A. Yes.

Q. And I am just curious.

Why did you decide upon 10 cents as opposed to 5 cents, 25 cents, or some other figure?

A. Again, that was in -- that value was in place since I purchased it. It seemed reasonable. My understanding is that it's been 10 cents since 1976.

Q. You learned that information from the previous owner --

A. Yes.

Q. -- who we talked about before, and that is your father-in-law?

A. Yes.

Q. All right. And however he came up with the figure of 10 cents, you don't have any information on that?

A. I do not.

Q. You have never asked -- I forgot his

106

name. I apologize.

A. Don.

Q. You have never asked Don for that information?

A. Asked Don how he calculated it?

Q. Correct, how he came up with 10 cents versus 1 cent, 5 cents, a dollar, or something else.

A. He told me -- I did ask him. He said that the original owner along with the accountant came up with the figure.

Q. There was a previous owner to Don, I take it?

A. Yes.

Q. So Don inherited the 10 cents from somebody else?

A. I believe so.

Q. Do you know who that was?

A. Joseph Zimmerman.

Q. Do you have any affiliation, association, or relationship with Mr. Zimmerman?

A. My wife does.

Q. Who is he to your wife?

A. What would you call it? Great uncle

107

maybe? I'm not sure.

Q. But a distant relative?

A. A distant relative.

Q. Is he still around?

A. He is not.

Q. He passed away?

A. He passed away.

Q. And in terms of how Mr. Zimmerman came up with the 10 cents, we don't know?

A. Other that he worked with his accountants.

Q. Other than what you just told me --

A. Correct.

Q. -- you don't have any direct information?

A. Correct.

Q. So is it fair to say that when you took over ownership of this restaurant approximately ten years ago, you did not make any decision to make the benefit or the meal credit to be 10 cents an hour?

A. I made the decision not to change it.

Q. You made a decision not to change it, but it wasn't your idea to institute this policy, this figure, in the first place?

108

A. Correct.

Q. And because you did not make a decision to institute the policy, I take it you did not run any financial analysis at the time in order to base your decision to pay -- to have a meal credit of 10 cents an hour?

A. Not when we purchased it, no.

Q. You have done an analysis of some kind since the filing of this lawsuit, correct?

A. Yes.

Q. And we will get to that in a second.

Between the time you purchased it and the time you ran the financial analysis after the lawsuit, did you do any other analysis of any kind to explain or provide a financial basis for the 10 cents an hour?

A. Yes. We did explore going to 25 cents an hour. I don't -- and this was a while back. I don't recall to what extent we did the analysis on it. We did look at it though.

Q. All right. And when would that have been, approximately?

A. Let's see. When did we do that? 2006-ish.

109

Q. Again, before the filing of this lawsuit?

A. Yes.

Q. And when you say we looked at it, who is the "we" in that sentence?

A. My wife and I.

Q. Did you consult with any other professionals to do this analysis?

A. No.

Q. And did you consult anyone, professional or otherwise, or any other materials in connection with this analysis?

A. Can you repeat the question, please.

(Whereupon, the record was read by the reporter as requested.)

BY THE WITNESS:

A. I guess I don't understand what you mean by materials.

BY MR. ZOURAS:

Q. Well, before you told me, for example, that you might receive an e-mail from the trade association or you could get on the internet to do some research on your own?

A. Yes.

Q. You had access to an accountant, that

110

sort of thing. Those are just examples.

A. Sure. We did talk to the accountant about it. I just -- let's see. We did the analysis, crunched the numbers, decided against doing it. No, we didn't take it very far because we -- you know, it was reasonable. The number we figured was reasonable, but we decided not to do it because the program itself was so well liked by the employees that we didn't really want to essentially take part of that benefit away from them or have it cost more for them. So we didn't go too far down the road with it.

Q. But it sounds like you did do some number crunching?

A. We did.

Q. And what did that consist of?

A. It was mostly manual. We estimated the cost of -- our cost to produce the food for the employees in terms of, you know, the actual cost of the food itself, the labor it took to cook the food, to try to come up with some frequency again as an estimate -- again, we didn't take it too far -- and figure out, you know, if we did take those values or that benefit amount out of their

111

payroll, you know, how it was to compare.

Q. Where did you get the data to run your analysis?

A. The data, that's food costs.

Q. Right. The data, where did you get it?

A. From our invoicing, our invoices.

Q. You didn't consult an outside vendor like Metrics?

A. Oh, no. No, we didn't.

Q. And it sounds like you used figures of food costs, labor costs to prepare the food. Anything else?

A. The cost of the food, some frequency of how much was used.

Q. Did you generate any reports or spreadsheets as a result of this analysis?

A. I can't say for sure. You know, I may have assumed that I would have done it on Excel, but it's not a document that I would have.

Q. You don't have it anywhere?

A. I don't have it anymore.

Q. All right. Have we now covered all the financial analyses that you would have conducted between the time you purchased the business and the

112

time of the lawsuit regarding the 10 cent meal credit and a basis for that?

A. Yes.

Q. All right. Let's just take care of this right now. 5.

(Whereupon, Sczurek Exhibit 5 was marked for identification.)

BY MR. ZOURAS:

Q. Do you recognize what I have shown you?

A. It's a job description for the server.

Q. Is that the job description that is currently in use, to the best of your knowledge?

A. Yes, to the best of my knowledge.

Q. I think we talked about this before, but all servers have essentially the same job duties and job description?

A. Yes.

Q. And that has been true for the last approximately four years?

A. Yes.

Q. And does this job description, Exhibit 5, in general accurately convey the job duties of servers at the Original Pancake House?

A. Yes.

113

Q. Is there a Department of Labor poster posted at the restaurant anywhere?

A. Yes.

Q. Where is it?

A. It is in the kitchen area.

Q. Okay. One poster?

A. We update it all the time. Currently, typically, it's one poster.

Q. And that is up to date, as far as you know?

A. Yes. We just did it not too long ago.

Q. All right. And we have been talking about this a lot, but have we discussed today all the reasons for your paying servers 10 cents less than the state minimum tip credit wage?

A. I don't understand the question.

MR. ZOURAS: Can we have it read back, please.

(Whereupon, the record was read by the reporter as requested.)

BY THE WITNESS:

A. I don't understand the question.

BY MR. ZOURAS:

Q. Okay. I will try to clarify it.

We have already talked about how servers

114

are not paid a cash wage of 4.95 an hour. Would you agree with me?

A. Correct.

Q. They are paid a cash wage of 4.85 an hour, yes?

A. Yes.

Q. And we can agree that 4.85 is 10 cents less than 4.95?

A. Correct.

Q. And have we discussed all the reasons why your restaurant pays servers 10 cents less than 4.95?

A. No.

Q. Okay. What are the reasons we have not covered?

A. Well --

MR. CONNEALY: Well, I feel like I need to object here because you can pay the -- you know, you can pay other benefits outside of cash benefits. So what we have been going over is that there is a 10 cent benefit. So when you put the meal credit back into the check, it's 4.95.

MR. ZOURAS: I know. But I am trying to exclude the benefit from my question.

115

BY MR. ZOURAS:

Q. You told me before it is a cash wage plus a benefit. I am removing the benefit from my question, and I am just on the cash wage right now. And I understand your position is you pay the benefit, so you make up for it, so it's okay. I get that.

A. Well, it's a deduction. You are paid 4.95 less the 10-cent deduction.

Q. Exactly. And I am just -- all I am trying to do is ask whether or not we have covered all the reasons why you do that.

A. Again, no. No. I mean, from a business perspective why do we do this? I don't understand the question.

Q. Well, let me try to summarize it.

We have talked about how you basically inherited this policy from a previous owner?

A. Yes. Yes.

Q. They had 10 cents, so you have 10 cents?

A. Yes.

Q. You have decided it was legal. You have done a financial analysis. You have consulted accountants. You consulted an e-mail you got from

116

a trade organization. And there are probably a few other things that I missed, but in any event we have discussed a few reasons today.

A. Yes.

Q. And I am just wondering if we have covered them all, as far as you know.

A. Okay. No, we haven't.

Q. We have not?

A. We have not.

Q. What have we missed?

A. Okay. We missed the benefit to my employees. Do I get to answer or no?

Q. You do. I didn't interrupt you.

A. Okay. I just want to make sure.

It's a benefit to my employees. It improves morale, it improves -- lessens turnover for the company, it's a -- you know, this benefit that I offer costs me far more than the 10 cents an hour to collect from my employees, but I do get something on the back side, which is customer -- I mean employee loyalty, punctuality. And to be quite honest, this meal nutritionally sometimes is the best meal some of my employees get all day long. You know, there are a lot of reasons why we

117

do this as a business.

Q. Okay. And I am just trying to make sure we have covered them all.

And your last answer sort of conveys employee morale reasons or employee, you know, happiness reasons, environment reasons, loyalty reasons. I get all that, and you have conveyed all that.

Are there any other let's call them more formal legal type reasons, and I know you're not a lawyer, but that you are aware of that we have not yet covered?

A. At this time, I can't think of any.

Q. Do you recall approximately when you would have first learned about this lawsuit?

A. I'd say December-ish of last year.

Q. 2012?

A. Yes.

Q. And upon learning of the lawsuit, and I'm excluding the lawyers, did you discuss the lawsuit with anyone?

A. I mean, internally we did, my wife, I mean, so we discussed aspects of the lawsuit but not -- I'd say we wouldn't put that knowledge out

118

there for anybody about a lawsuit.

Q. Sure. Sure. And I'm just trying to get a grip on who would have been involved in these internal discussions. Obviously, your wife?

A. My wife and I.

Q. Okay. And you have already told me about conversations you have had with management that at least relate to the lawsuit.

A. Correct.

Q. For lack of a better word, it's fair to say that following the lawsuit, you conducted an investigation; is that fair?

A. Yes.

Q. And part of that investigation included your going to managers to find out whether or not the two Plaintiffs actually consumed meals, correct?

A. Yes.

Q. And you did that because that was the only way you had to learn that information, correct?

A. It was the easiest way. You know, there may have been some other way as of those kitchen checks that I mentioned earlier that I didn't go

119

and look for. So there may have been other ways. I just -- that was the simplest, most direct way.

Q. So you said you have those kitchen checks. Can you look for them and give them to your lawyer if you find them. You agree to do that?

A. I can look for them.

Q. That's all I ask. And if they don't exist, you can't produce them.

A. Oh --

Q. But if they do --

A. Oh. Yes. Yeah. Sure. Exactly.

Q. Okay. Fair. But in any event, so you have asked your managers about meals actually consumed?

MR. CONNEALY: One point of clarification, and we can just do this off the record.

MR. ZOURAS: Sure.

(Whereupon, a discussion was had off the record.)

BY MR. ZOURAS:

Q. Correct me if I'm wrong, but I think we have established that to the extent the checks have any significance, it would be because let's say

120

Chelsea wrote her name on a check, yes?

A. Regarding the Plaintiffs, yes, if that's what you're --

Q. Sure. Well, that would be true if we are talking about --

A. I mean, there may be checks with other people's names on them, but --

Q. Of course. But in other words, we are trying to figure out -- I am trying to figure out --

A. Yes.

Q. -- what meals an individual employee like Chelsea would have eaten at your restaurant. You told me one way to do it may be to look at checks with her name on it, yes?

A. It would have been some information there, yes.

Q. Now, and I asked you if you have those and you're not sure?

A. Correct.

Q. You are going look, and you are going find out, and if you have any, you are going to give them to your lawyer, yes?

A. Correct.

121

Q. And we are talking about checks with somebody's name on it as opposed to all the checks in the universe, right?

A. Correct.

Q. Because all the checks in the universe, that wouldn't help us. Correct? Okay. So with that information --

MR. CONNEALY: To the extent that we know the class of employees who were served by the benefit.

MR. ZOURAS: Well, we do know that.

MR. CONNEALY: Yes, so that's what I'm saying. So we do know that, so you've got that in the form of the Excel sheets.

MR. ZOURAS: I understand that, but now I have a separate question, and my separate question is, for example, what did Chelsea consume.

THE WITNESS: The checks that you asked for would be reflected already in those documents that you have.

BY MR. ZOURAS:

Q. Okay. Well, then, I mean --

A. I mean the numbers part. It wouldn't have a name associated with it.

Q. Thank you. I get that.

122

A. Okay.

Q. But let's say I really wanted to associate a name with it.

A. And that's fine.

Q. And, you know, you're saying there may be a way to do it; there may not be. But if there is a way to do it, the only way you know of is to find a check with somebody's name on it. That may or may not exist, correct?

A. Yes.

Q. But if it does exist, you are going to look for them, and you are going to give them to this guy over here to your left, yes?

A. Yes again.

Q. Thank you. Okay. I'm not even sure I remember where I was.

MR. CONNEALY: Sorry.

BY MR. ZOURAS:

Q. Where I was, was we discussed how you first learned of the lawsuit and your investigation.

A. Okay.

Q. And we discussed how you consulted your managers about whether or not the two Plaintiffs

123

consumed meals, and we have already talked about all that.

You told me before that you believed somebody told your wife, either Ms. Schneider or somebody else, Ms. D'Agostino, that they had consumed meals at the restaurant. Did I understand you correctly, or did I get that wrong?

A. If you could --

Q. Let me try to rephrase it.

A. Yeah.

Q. Do you know whether Ms. D'Agostino or Ms. Schneider told any human being on this planet that they ever consumed meals at your restaurant?

A. Yes.

Q. Okay. Who?

A. Ms. D'Agostino -- oh, no, I'm sorry, it's Ms. Schneider.

Q. Chelsea Schneider?

A. Yes.

Q. Told who that?

A. My wife.

Q. Were you present for this conversation?

A. I was not.

Q. When did this conversation take place, as

124

far as you know?

A. It was in December of -- yeah, December of 2012.

Q. Soon after --

A. Shortly after we received notice of the lawsuit.

Q. And how is it that you know Ms. Schneider allegedly said this to your wife?

A. My wife told me.

Q. Soon after the conversation?

A. Yes.

Q. And what did your wife tell you about that discussion?

A. That there were several accusations in the lawsuit, she went over all of them with her specifically asking her about, you know -- you know, I believe it was overtime, employee meals, whatever was in there, and trying to understand what the point of that was because it didn't make sense to us.

She said that the only issue that she -- I mean, Chelsea specifically said that, you know, she was fine with the employee meals, she doesn't have them on a regular basis, only when she

125

was there. Her issue was the amount of tips that she had to claim that she received to report to payroll.

Q. Okay.

A. Chelsea felt very strongly that the law was she only had to claim 8 percent and that basically she didn't want to pay taxes on the rest of it. And we told her that is a myth in the restaurant industry, that you have to claim every dollar that you put in your pocket. It's a federal law, it's state law, it's what we have to explain to you, and that's what we have to have you do.

Q. You are getting all this information from your wife?

A. Yes.

Q. And when your wife told you about it, was there anybody else present?

A. Not that I recall.

Q. Do you know if your wife documented this conversation she had with Ms. Schneider in any way?

A. She didn't mention it to me if she did or not.

Q. Did you ask her to?

A. Did I ask her to do it?

126

Q. Yes.

A. No.

Q. Did you talk to Ms. Schneider about the allegations of the lawsuit?

A. No, I believe I did not specifically address any allegations in the lawsuit with her.

Q. Did you discuss the allegations of the lawsuit with Ms. D'Agostino?

A. No. She -- she, I believe, was terminated prior to the lawsuit.

Q. Ms. Schneider was still employed at the time?

A. Yes.

Q. Let me show you what we will mark as Exhibit 6. This is going to be a group exhibit.

(Whereupon, Sczurek Exhibit 6 was marked for identification.)

BY MR. ZOURAS:

Q. Do you recognize this document?

A. It's a paycheck stub.

Q. Looks like a paycheck stub issued by 7 Zimmie's for Chelsea Schneider?

A. Yes.

Q. And this would be pay period ending

127

probably on September 16, 2012, at least the first one is, the first page?

A. That's the pay date.

Q. That's the pay date?

A. Yes.

Q. And the second one is a pay date for August 19, 2012?

A. Correct.

Q. I just want to go through a couple of things.

In addition to basic, you know, personnel information, address, Social Security number, employee I.D. number, we have things like hire dates; is that right?

A. Yes.

Q. By the way, the employee I.D. number, is that the same I.D. number they enter into the POS system that we talked about earlier?

A. No.

Q. Okay.

A. It's a payroll I.D. number for Paychex.

Q. All right. Are these documents produced by Paychex?

A. Yes.

128

Q. And does Paychex directly pay the employees?

A. They print the checks, send them to us, and we pass out the checks.

Q. Are they physically passed out, or are they mailed? What happens?

A. Typically they're handed, physically passed out.

Q. The servers are paid on a biweekly basis?

A. Every two weeks, yes.

Q. And on this pay stub, we have information -- it looks like we have regular hours. Are you with me?

A. Yes.

Q. Okay. And are those the hours that are generated on the POS system by the server pressing the clock in and clock out button?

A. Yes.

Q. That information is somehow relayed directly to Paychex?

A. It goes -- the POS system creates a -- there's a payroll interface that our vendor for POS company and Paychex, I don't know exactly how it work, but there's an interface software pieces that

129

the payroll data goes into the interface and it goes to Paychex' software that sends us to Paychex which is the checks, which sends hard copies of the checks back to us.

Q. Understood. This interface, who has access to it at your restaurant?

A. I think it's just an integral part of the POS software. I don't know if it's -- I don't know much about it. It's --

Q. Are the time entries reviewed by anybody at your restaurant before they go to Paychex so that they can process payment?

A. Yes.

Q. By whom?

A. Then at the end of every shift, we have the manager print a time summary report, I forget the exact title, but which basically shows all the punches for all the employees for the day, we review it to make sure the people are punched in, they punched out, breaks are appropriate. That's the first line of review.

And then, you know, obviously, if there's an error or something, if somebody forgets to punch out or punches out for break, doesn't

130

punch back in, not the servers, then it's corrected.

And then at the end of the week, there is a weekly payroll report which is then reviewed a second time to make sure that people have punched in, punched out, servers have claimed tips, and that's finalized.

And then at the various two-week pay period, there is a final file that includes two weeks' pay punches. That's sent through the interface to Paychex software which is sent out to you to through Paychex. So it's verified several steps before.

Q. Understood. All right. So on a daily basis, the payroll reports are reviewed by the managers?

A. Yes.

Q. And if they detect an error, is there a protocol for what they are supposed to do to correct the error?

A. Sure. They document the employee that didn't whatever, depending on what happened or didn't happen, to figure out the correction, and then they make the correction.

131

Q. And the manager has the power to make that correction right on the POS system?

A. Yes.

Q. Does he generate a report of some kind indicating that he made a correction?

A. No. Servers have access to all their time punches, and it shows if it's corrected or not corrected or if any adjustments are made to it. They can print that any time they want.

Q. So a report could be generated indicating that a correction had to be made?

A. I believe so.

Q. And you said that there was a weekly payroll report that is also reviewed?

A. Yes.

Q. Who reviews that report?

A. My office staff.

Q. Is there a specific person tasked with that responsibility?

A. Not particularly, no.

Q. Who are the persons who could be doing that on a regular basis?

A. Chris Byrne.

Q. Your office manager?

132

A. My office manager.

Q. Anybody else?

A. And two of our clerical staff that are there.

Q. And how would they go about making this weekly review?

A. They hard-copy all the time punches for the week, print it, and sit at the office and manually go through to make sure people punched in and punched out and claimed tips.

Q. Does your office manager reference any other documents, like schedules for example, to do this review?

A. If there is a conflict, yeah, that if they think somebody worked at, for example, if it's -- it doesn't happen very often with servers though because they can't use this system unless they are punched in.

An example would be if a server punched in the wrong job code, they punched in as a host instead of a server. So they have claimed tips when they punched out, and then it comes up and says, "Oh, hey, we see tips for the day," and that generates a phone call, "Hey, did that employee

133

work as a host or work as a server," and the forms are adjusted.

Q. And does your office manager have the authority to make any adjustments that are needed?

A. They can, but they usually call the manager and have the manager manage it, yes.

Q. So the general procedure is that if there is some discrepancy, the office manager should contact the manager overseeing the particular server to resolve it that way?

A. The manager that worked the day that was in question.

Q. Fair enough. And then the manager typically would enter any corrections as necessary?

A. Yeah, he investigates whatever the situation would be, comes up with a solution, and would make corrections as needed.

Q. And then after a two-week period, there is like a final report generated that goes to Paychex, yes?

A. Yes.

Q. Who generates that final report?

A. Again, it's generated in the restaurant.

Q. Okay. In the restaurant?

134

A. A hard copy is generated in the restaurant.

Q. In the restaurant. And who generates it?

A. I think it's like an automatic report that just prints at the end of close. I don't recall, I apologize, if it's automated or if the manager runs it on Mondays.

Q. So it's not done by Ms. Byrne at your office?

A. No.

Q. Ms. Byrne does do her weekly analysis at your office, though, right?

A. Yes, she comes into my office to do that. Yeah.

Q. Right. And so the two-week report is generated at your restaurant, and then it has to get to Paychex somehow, right?

A. Yeah. It's electronically sent to Paychex, yes.

Q. It's all electronic. Who sends it?

A. Chris Byrne.

Q. And is it reviewed before it is sent?

A. Yes, it is. And then at the end of every two weeks, the report's reviewed, the

135

pay -- once everything is finalized, everything looks good, they print the -- they process the Paychex file, whatever you call it, payroll file, which goes through this interface, which goes into the Paychex software, which then sends it to -- yeah, so it is all verified before to create the payroll file.

Q. And then once it gets to Paychex, they do their internal payroll processing?

A. Correct.

Q. What percentage of Ms. Byrne's time is spent at your office versus the physical restaurant?

A. She spends no time at the restaurant.

Q. I may have misunderstood you. I thought Ms. Byrne does the final two-week review at your restaurant?

A. No. No. The report is printed at the restaurant.

Q. I see. How does it get to Ms. Byrne then?

A. I usually bring it.

Q. You just drop it off?

A. Yeah.

136

Q. Okay. Got it. All right.

And for this two-week final review, does she essentially look for the same items you described before as far as discrepancies and so forth?

A. Yeah, the two review each week individually, two-week review for making sure that, you know, overtime is done correctly and all of those things are done on a weekly basis, then they just add the two together and they verify that the addition is correct and it is sent to us.

Q. You mentioned overtime.

Do you agree that the servers are entitled time and a half for all time worked over 40 in any given workweek? And I mean 40 hours.

A. Yes.

Q. And they are at your restaurant, yes?

A. They are.

Q. If we continue on with the pay stub, Exhibit 6, the first page we were looking at, if we look at the right and see our rates, 4.85, we have already talked ostensibly about what that is. We are multiplying 4.85 times the regular hours which I see here, and this is for a two-week period, yes?

137

A. Yes.

Q. Okay. So the reason there is no overtime indicated here is because they did not hit 40 hours in any given workweek?

A. Correct.

Q. How do we know that the 53.03 was not all worked over a one-week timeframe?

A. It's the reports, the weekly reports that I just mentioned.

Q. So looking at this, we wouldn't be able to make that determination?

A. On the paycheck?

Q. Yes.

A. If we only looked at this document, no.

Q. You can't tell, but you do have other reports that do show that?

A. Yes.

Q. And you have seen an internal system that will start paying overtime after 40 hours in any given workweek, yes?

A. It's part of the POS system. You work more than 40 hours, it generates the overtime.

Q. All right. Fair enough.

If we move along here, we see an entry

138

for meals. Are you with me?

A. Yes.

Q. And it says $5.30?

A. Yes.

Q. Is that simply 10 cents times the number of hours that they put in?

A. Yes.

Q. Who typically handles scheduling the servers at the restaurant?

A. The manager.

Q. Is there one manager tasked with that responsibility, or do they all do it?

A. Typically it's the same manager that does it.

Q. All right. And do you have any insights as to how they generate schedules for the servers?

A. What do you mean how?

Q. Do they generate a written schedule, do they use a computer, do they use Excel, do they do it verbally, do they do it by e-mail, fax?

A. It's some hand-written schedules.

Q. Does the schedule change every week?

A. It can.

Q. And how do these servers receive notice

139

of the schedule?

A. It's posted every Sunday, 2:00.

Q. Do server schedules typically vary from week to week?

A. Again, they can.

Q. So they would have to check the new schedules to know exactly when they are going to be working for the upcoming week?

A. That's the final version. Typically, it's discussed with them if there's a large change or something. They usually work set hours, but, you know, similar days during the week if then something changes or if they work more or work less, it's usually discussed with them before it's posted so it's not a surprise.

Q. Sounds like you try to keep a consistent schedule, but due to the ebb and flow of the business, adjustments have to be made?

A. Correct.

Q. And are they typically scheduled for 40 hours?

A. Servers?

Q. Yes.

A. No.

140

Q. What are they typically scheduled for?

A. A server works five days a week, typically, and would work about 30, 32 hours.

Q. And is that because they are scheduled for a seven-hour shift?

A. Well, we are not open that long typically, and it is just based on business and we do staggered shifts, so the first people to come in are the first people to leave typically, and so --

Q. What are your normal business hours?

A. Monday through Friday, we are open 7:00 until 3:00 and weekends 7:00 until 5:00 in the afternoon.

Q. Saturday and Sunday?

A. Yes.

Q. What is the earliest time a server would be scheduled to work?

A. Normally 6:30. There are some special circumstances sometimes where it could be earlier, but yeah.

Q. And are they typically scheduled to work until -- well, what is the latest they would be typically scheduled to work?

A. You have closers, and that depends when

141

customers leave.

Q. So it certainly could be past 5:00?

A. Yes.

Q. And it sounds like it varies from day to day?

A. Yes.

Q. And that's because we don't know exactly when the last customer might decide to leave?

A. Correct.

Q. And I take it the server is responsible for staying until the last customer leaves, if not beyond?

A. Sometimes. I mean, most of the time, yes. Sometimes, if customer is just sitting there, and there is no need for a server to be there, that person will say, "Hey, can I go home," and the manager says, "Fine, I'll finish whatever.

Q. Understood. Is there a typical number of hours that they are scheduled form, like any day on a particular shift?

A. Again, it varies based on business. There is not a -- no.

Q. There is no set shift time?

A. No.

142

Q. And it sounds that is because it is the nature of your restaurant, you are mainly a breakfast-lunch restaurant?

A. Correct.

Q. Okay. Would you agree with me that there are times where servers do hit overtime hours?

A. Yes.

Q. And we could produce a report to indicate when that would have happened, yes?

A. Yes.

Q. To the best of your knowledge, are servers ever required to perform work before the start of their scheduled shift?

A. No.

Q. No one has ever told you that that has taken place, yes?

A. I've never been told, never observed.

Q. I will show you what we will mark as Exhibit 7.

(Whereupon, Sczurek Exhibit 7 was marked for identification.)

BY MR. ZOURAS:

Q. And I will ask you if you recognize what I have shown you as Exhibit 7.

143

A. Yes.

Q. What is that?

A. It looks to be the server sideboard chart.

Q. What is server sideboard?

A. There are -- essentially, it's common areas of the restaurant that all servers share. Instead of having everybody there be responsible to do the same thing, we divvy it up and break it into groupings. So each person is assigned to a specific task to wipe down and clean up, restock, that kind of thing.

Q. Is it that each station designates a different part of the restaurant?

A. I'm sorry, yes. Each server is assigned an area, a grouping of tables, and within the restaurant we call that a station.

Q. Got it. How many tables per station, roughly?

A. Depending on the day, anywhere from three to seven. I don't know. Sometimes in the day, one server can have the entire restaurant.

Q. All right. And it likes that there are different duties depending on the stations?

144

A. Correct.

Q. There is some overlap. There are some of the same duties, but there are some different ones too, yes?

A. There may be some, yes.

Q. And do you consider all the tasks listed on Exhibit 7 to be work for which a server is entitled to compensation?

A. I guess I don't understand that question. Do they get paid to do this? Is that what you are asking?

Q. I am asking if a server performs the work listed in Exhibit 7 here, do you believe that they should be paid for it?

A. Yes.

Q. Are there any items on here you believe that should not be paid for?

A. No.

Q. And if a manager were to tell a server to arrive early before the start of their scheduled shift to perform some of their duties, you would agree the server should be paid for that?

A. They should punch in. Yes.

Q. All right. And you agree that a manager

145

may tell a server not to punch in before their scheduled start time even though they have already started work; that's a violation of your company policy?

A. Yes.

Q. That might even be cause for discipline of a manager if that happens?

A. Oh, absolutely.

Q. And you haven't learned of that ever happening, yes?

A. No.

Q. If a server were told by the manager to come in early to perform some of these tasks before they punch in and start their workday for pay purposes, what would you expect that server to do?

A. Insist on punching in.

Q. Okay. And anything else?

A. Depending, if this manager accommodated the server or not.

Q. Let's assume not.

A. Then she shouldn't do the work or she should contact, you know, the manager or the supervisor or me directly.

Q. Okay. Anything else?

146

A. No.

Q. We talked about how on the pay stubs we have a date for the server hire date. Is that information maintained internally by your restaurant?

A. I'm sorry. One more time.

Q. If I wanted to know the start dates of employment for servers at your restaurant, would I have to contact Paychex, or is that information you could tell me directly?

A. It's on our Paychex software. We could -- but I think we record all the start dates on the --

Q. You could generate a report for that?

A. I assume we could. I don't know if I've ever done it.

Q. Maybe?

A. Yes.

Q. Okay. Fair enough. Other than -- well, strike that.

Has anyone ever complained to you directly about not being paid for all time worked?

A. No.

Q. Have you heard of any such complaints at

147

your restaurant?

A. No.

Q. Would you agree with me that from time to time employees do have certain complaints about their work environment? It happens?

A. Well -- okay. I don't know. Yes.

Q. Well, for example, Ms. Schneider had a complaint that you discussed with her following the filing of this lawsuit, yes?

A. Yes.

Q. And there have been other times employees have complained about different aspects of their employment?

A. Right.

Q. Throughout your ten years, right?

A. Yes.

Q. If we wanted to look at a record of those types of complaints, do you have one to show us?

A. A single record that records all the complaints in the restaurant, the answer is no.

Q. Would those complaints be lodged -- or, I'm sorry, would those complaints maybe be contained in the employee's personnel file?

A. If there was a very specific complaint,

148

sometimes, depending of -- on a resolution of the problem.

Q. For example, Ms. Schneider's complaint, did you record that anywhere?

A. The complaint regarding --

Q. The one where you sat down with her and she said that she had a concern about taxes and so on?

A. That was in response to the lawsuit.

Q. I understand.

A. So I didn't -- no, I didn't do it. Obviously, I had the lawsuit. I didn't need to record that.

Q. I understand that.

MR. CONNEALY: Let me clarify. Was that you or your wife, that previous testimony? Did you have the conversation with Ms. Schneider?

THE WITNESS: No, my wife. I assume what's you were trying to --

BY MR. ZOURAS:

Q. Well, it is really both. Maybe it was Ms. D'Agostino. I thought you sat down with one of the Plaintiffs here.

A. My wife did.

149

Q. You did not talk to them directly? We have established that?

A. Yes, we did before.

Q. All right. So following the discussion with your wife, you don't know if she memorialized that anywhere, and I think we established that as well?

A. Correct. We did.

Q. Is there a policy for memorializing in writing complaints of employees at your restaurant?

A. If the complaint is of a minor nature and if we discuss the situation with the employee and it is resolved, typically it's not. If there is a bigger deal like, for example, maybe a harassment or something, then that stuff is all documented. You know, if there is violence at the workplace, something serious, it would be documented.

Q. And where would it be documented?

A. Well, typically we have reports, and it is filled out by the other manager, depending on who is handling it, the manager or myself, and we typically go in a -- again, depending on what the situation is, we would have that documented.

150

Q. So harassment, that's a serious complaint, yes?

A. Right.

Q. And you would document that somewhere, right?

A. Yes.

Q. And that document would end up in what file, if any?

A. Usually -- I mean, it depends, but usually it would go into the employee's file.

Q. You keep personnel files for each employee?

A. We do.

Q. And if there are any complaints, we would expect to find them there, at least if it's of a serious nature?

A. Correct.

Q. We discussed all the at least initial discussions you had with your wife and your managers upon learning of the lawsuit in December of 2012, yes?

A. Yes.

Q. Other than lawyers, did you consult with anyone else at that time about the allegations of

151

the lawsuit?

A. Can I get the question repeated.

(Whereupon, the record was read by the reporter as requested.)

BY THE WITNESS:

A. Well, my wife.

BY MR. ZOURAS:

Q. And I'm excluding -- we've already talked about the discussions with your wife, the managers. Now I'm looking for anybody else that you would have talked to in connection with your investigation, you know, to learn if the allegations had merit or not.

A. Oh. Various employees.

Q. We have talked about everybody already?

A. Yes.

Q. In other words, you didn't ask any other employees whether or not they witnessed Ms. Schneider eating on duty or not?

A. Not that we haven't discussed.

Q. Got it. Same thing for Ms. D'Agostino?

A. Yes.

Q. You -- strike that.

Following the lawsuit, is it true that

152

you did some financial analysis at the restaurant? Maybe I'm not being specific enough.

A. Financial analysis every day.

Q. Following the lawsuit, you did some financial analysis in order to explain why servers were being paid $4.85 per hour plus the benefit, the 10 cents of a meal credit, correct?

A. That we took a deduction of 10 cents, yes.

Q. And what did that analysis consist of?

A. My understanding is we had to determine the value of the employee meals we were providing to our employees and compare that to the total of the deductions that we took out of their -- the paychecks.

Q. And did you do that?

A. I did.

Q. How did you go about doing that?

A. The first thing was we had to determine our cost for the food that was -- let's see. First I would add and determine the cost of the food that we provided to the employees. Okay? We did that by finding the average cost or the total cost of all the food we purchased in the restaurant, and we

153

broke it down into one-year periods for that year and found out what percentage that cost was of each dollar in revenue that we generated in food. We called that the food cost. Very standard procedure in the industry.

The next step we did was we determined from the POS system all the employee meals that were ordered. We had to convert or find out the menu price value of every one of those employee meals, so because it's the exact same menu item whether it's an employee who orders it or a customer who orders it. So we had to take that menu item, convert it to the equivalent menu price.

So we had the total of all -- the equivalent of the price of all employee meals that were consumed by the employees, and then based on that original food cost as a percentage of the sales, we were able to figure out what our cost was for providing those employee meals. And then we compared that number to the deductions, total deductions from employees' payroll.

Q. And what did you learn?

A. That I'm losing my butt.

MR. CONNEALY: You can refer to your report too

154

or your notes too, if you want, on some of this stuff.

BY THE WITNESS:

A. That we -- that our costs are significantly greater than what we collect from employees.

BY MR. ZOURAS:

Q. Did that result surprise you?

A. No.

Q. Did anything prevent you from conducting a similar analysis before the lawsuit was filed?

A. Physically prevent me?

Q. Physically, mentally, any way?

A. No.

Q. And in terms of getting the data in order to conduct this analysis --

A. Yes.

Q. -- did you have it all, or did you have to consult Paychex or some other third party to get all the data?

A. I consulted Positouch, which is the company that sold us the POS software. I explained to them the information I needed to get out of the system, and they were very quick to point out how

155

it was done. So I pulled all the information out of the system, created a database, and that's how we started.

Q. Understood. Just so we are clear --

A. Yes.

Q. -- is it true that Paychex did not play a role in this financial analysis?

A. Well, we used their software to generate compensation reports, so --

Q. You didn't consult with anyone at Paychex to conduct this analysis?

A. We may have asked somebody how to run the report, but other than that, that was the extent of it.

Q. All right. And the extent of Positouch's involvement was similarly how do we run the reports and get information from the POS system?

A. Exactly. It was a very brief conversation.

Q. Understood. Now, in terms of the procedure you just described that you had to go through to get this analysis --

A. Yes.

Q. -- how did you know to do that?

156

A. Well, I knew I had recorded employee meals into the POS system. I had to get that data out. Just a --

Q. But did you conduct some independent research which told you that, "Hey, I need to figure out what my costs are, here is how I am going to do it, here is how I am going to compare it to, you know, the 10 cents," and so forth? I mean, how did you know how to conduct your analysis?

A. I created it myself. I mean, I understood what the goal was, and this was the process I came up with.

Q. And I don't want you to breach any privileged information, but, I mean, outside of talking to your lawyers --

A. Yes.

Q. -- did you independently decide what the goal was?

A. The goal?

Q. Yes.

A. No. The goal was in consultation.

Q. So you didn't do any independent research to determine that, right?

157

A. No.

Q. The goal was determined based upon conversations with your lawyers, which I don't want you to tell me about, correct?

A. Yes.

Q. Okay. Fair enough. All right. So let me see if I can show you what we have marked as Exhibit 8 or will mark.

(Whereupon, Sczurek Exhibit 8 was marked for identification.)

BY MR. ZOURAS:

Q. Do you recognize what I have shown you as Exhibit 8?

A. Yes.

Q. What have I shown you as Exhibit 8?

A. This is a summary of our sales, cost of food, cost of cooks taken from our income statements for three years.

Q. Could we fairly describe these two pages as a summary of the analysis you did that we just discussed?

A. Is this a summary of the total analysis? No.

Q. Okay. Let's just talk about the first

158

page, the first bucket of information.

A. Yes.

Q. Top half. It's broken down on a monthly basis starting in November of 2009 and going through October of 2010?

A. Yes.

Q. Sales is gross sales for the entire restaurant?

A. It's net sales. It's sales less sales tax.

Q. Thank you. The next column is Cost of Food. Where did you get that information?

A. It's generated from inventories that we do.

Q. And that --

A. Again from the income statement.

Q. And that is done on a monthly basis?

A. It's done on a monthly basis.

Q. All right. And the total is the gross cost?

A. Yes.

Q. Next column, Food Cost Percentage, what does that represent?

A. That's the percentage of the cost of the

159

food as compared to the sales. In other words, for every dollar in sales, it cost me 19.86 cents for the month in food.

Q. Understood.

Next column is Cost for Cooks. What does that represent?

A. It's the cost for the cooks to prepare the food.

Q. Who did you include as cooks?

A. Anybody that actually physically cooked food and prep cooks.

Q. And this is payroll cost?

A. Yes.

Q. It's gross or net?

A. This is -- I could refer to the document here, right?

MR. CONNEALY: Sure.

BY THE WITNESS:

A. I'm sure I could turn it out here.

MR. CONNEALY: And, Jim, just so you are aware, I've got the monthly income statements that make up these entries.

MR. ZOURAS: Sure.

MR. CONNEALY: So, you know, if it streamlines

160

things, if he wants to look at that, it's -- you know, it's up to you.

BY THE WITNESS:

A. That's gross earnings.

BY MR. ZOURAS:

Q. Cost for cooks is --

A. Gross.

Q. -- gross pay?

A. Yes.

Q. All right. The next column is called Cook Labor Percentage. What does that represent?

A. That's the percentage of the cost for the cooks as compared to the sales.

Q. Okay.

A. So for every dollar of sales, it cost me 7.6 cents to cook the food.

Q. For the month of November 2009?

A. Correct.

Q. So if we combine Food Cost Percentage and the Cook Labor Percentage, we get the cost, I guess, for generating food at your restaurant?

A. Part of the cost, the simplest and easiest to convey.

Q. I follow you. Right. And in terms of

161

how this relates to the allegations of the complaint, what information on here is pertinent as far as you are concerned?

A. We are relating my costs to generate a dollar's worth of revenue. That's the goal of this.

Q. And we have done that for 2009, 2010, 2011, all the way through October of 2012?

A. Yes.

Q. And we have done it for three years starting in November of 2009 and going through October of 2012?

A. Correct.

Q. And that is what the bottom half of Page 2 tells us?

A. It's a composite, yes.

Q. All right. Okay. I am going to represent to you that your lawyers have produced a number of spreadsheets to us that look like they have been generated on Excel, and they have labels such as Employee Meals, All Sales, Discounted Meals, and other similar titles.

Are you familiar with those spreadsheets in general?

162

A. Yes.

Q. Were those spreadsheets generated the way you have previously discussed with me?

A. From that process, yes.

Q. From that process? So let's just mark this as Exhibit 9.

(Whereupon, Sczurek Exhibit 9 was marked for identification.)

BY MR. ZOURAS:

Q. This is just a sample. It's the first page of the spreadsheet which was called Employee Meals.

A. Okay.

Q. All right? And first of all, do you recognize this as what I just told you, more or less?

A. Yes.

Q. And what information is contained in this spreadsheet?

A. What is the exact title of this file this came from?

Q. It's called Employee Meals, I believe.

A. Okay. Employee Meals.

MR. CONNEALY: You know, you've got your notes

163

here too, and since we have them involved --

MR. ZOURAS: Yes, no. No.

BY THE WITNESS:

A. I'm not sure what's on this specific sheet, but let me see this. I believe this is the raw data for all menu items running under user number 444.

BY MR. ZOURAS:

Q. All right. And that is relevant because, as you told me before, 444 is the code used for an employee meal?

A. Correct.

Q. By all the employees. Yes?

A. Yes.

Q. So hopefully this spreadsheet will contain every employee meal consumed by every employee over the course of the time period we have referenced?

A. Correct.

Q. And so when we say 444, we have to go several columns over, and it says, I think, at the top is use, user time, user, or something along those lines?

A. Yes.

164

Q. And, you know, it is going to have that and it is going to have cost for all those meals, is that fair to say?

A. Depending on what sheet this is, and the raw data has the meals -- this is a menu item report. So it lists all the menu items that were rung in, okay, which several of these combined to represent an order, okay, but these are just individual line items, because that's how we track --

Q. Okay.

A. -- of the various food items.

Q. I follow you.

The first column is the date. That's pretty self-explanatory?

A. That's right.

Q. Right?

A. Yeah.

Q. And so in terms of menu items, is there a value or a number that is linked to a specific menu item on this spreadsheet?

A. Yes, there is.

Q. All right. And where is that?

A. These are truncated columns. I think

165

it's --

Q. I know.

MR. CONNEALY: I might have a Rosetta Stone if you need it.

MR. ZOURAS: I understand. Yeah.

BY THE WITNESS:

A. I believe it's the six column numbers from the left.

BY MR. ZOURAS:

Q. Right. So, for example, the first one is zero, then we have 601, 610, 612?

A. 622.

Q. Or 622, I'm sorry.

A. 625.

Q. Those numbers, you believe, designate menu items?

A. Yes.

Q. So based on those numbers, we can figure out what the cost is for each menu item?

A. This is all the menu items. Okay? The menu items, the primary function of the menu item is to identify food that we collect money for when we sell, and it has other functions. It has descriptor functions. We may assign a menu item

166

number to something, let's say over-easy eggs, so we can track how many times we sell these things. So really it has no value as a -- other than a descriptor, as we call it. So those all have to get stripped out. So we end up with just the menu items that is actually representing tangible food items that are served by servers.

Q. And you can link those menu items to a specific cost?

A. Yes.

Q. And you did that?

A. Yes.

Q. That's how you did your analysis?

A. Yes.

Q. Okay. And in connection with your analysis, if I am not mistaken -- and it will take us a step further -- you actually figured out all sales for the restaurant, all food item sales, yes?

A. That's where we started, yes.

Q. All right. And so we can straighten this out, I will show you what we will mark as 10.

(Whereupon, Sczurek Exhibit 10 was marked for identification.)

167

BY MR. ZOURAS:

Q. And I will represent to you that this is the first page of the spreadsheet called All Sales that was produced.

A. Okay.

Q. And I take it you are familiar with that?

A. Yes.

Q. And this has similar information as the spreadsheet we just talked about titled Employee Meals, except it is not just limited to servers or employee meals, it's all meals --

A. Correct.

Q. -- at the restaurant, whether they were consumed by customers, servers, managers, and so forth, right?

A. Yes.

Q. Exhibit 9 has all employees, servers, busboys, hosts, kitchen staff, everybody who is an employee, yes?

A. Yes.

MR. ZOURAS: Okay. We will go to 11.

(Whereupon, Sczurek Exhibit 11 was marked for identification.)

168

BY MR. ZOURAS:

Q. I will represent to you that this is the first page of a spreadsheet called Discounted Meals?

A. Yes.

Q. And I take it this contains similar information as Exhibit 9 because it's only for employees, except it is for the meals we talked about earlier that are not free, but they are at a discount; is that fair?

A. Correct.

Q. All right. Is there any other relevant information on this spreadsheet other than what I just tried to explain?

A. All the totals or --

Q. I understand.

A. -- the information like that.

Q. I understand. The menu items are on here in the same column as they were on Exhibit 9. Is that fair to say?

A. Yes.

Q. And similarly, we could link that menu item to a specific discounted meal cost?

A. Yes.

169

Q. And you did that as part of your analysis?

A. Yes.

Q. And for each of these spreadsheets for each of the years, 2009, 2010, 2011, and 2012, you generated a summary of the information that was contained?

A. Yes.

MR. ZOURAS: Well, so let's label this as the next --

BY THE WITNESS:

A. Well, no, there was not a summary for every single sheet. We drilled down to -- what was this? The summaries were done for the spreadsheets that indicated only the tangible food items consumed by employees. As an example, I did not do a summary for the All. That's --

BY MR. ZOURAS:

Q. That would be irrelevant to this case.

A. Exactly, but that's not how you phrased your question. So --

MR. ZOURAS: Fair enough. Okay. So let's show you what we will mark as whatever the next exhibit is.

170

MR. CONNEALY: 12.

(Whereupon, Sczurek Exhibit 12 was marked for identification.)

BY MR. ZOURAS:

Q. So I will represent to you, as it implies here, that this is taken from the Meals spreadsheet for November 2009 to November of 2010. And is this one of the summaries that you just referenced?

A. I guess you could call it a summary. It has some information that is summarized from other reports or other spreadsheets, yes.

Q. Well, what information is contained on this summary?

MR. CONNEALY: I need to know what files these came from.

MR. ZOURAS: Yeah.

MR. CONNEALY: Well, if this is accurate --

MR. ZOURAS: Yeah. And I'm going to represent --

THE WITNESS: Instead of generalities of what stuff is.

BY MR. ZOURAS:

Q. Sure. And, again, I mean, there is no heading on these documents, unfortunately, but I

171

will represent to you that it did come from something that had that label on it in the upper right-hand corner (indicating). So assume that's accurate, if you will. Does that help you?

A. Okay. I'm assuming that this is the no-charge meals for employees.

Q. I believe that's accurate. Yeah.

A. That's what it looks like.

Q. Right.

MR. CONNEALY: For 2009-10?

THE WITNESS: Right, for that year. Now, I'm sorry, what was the question again?

BY MR. ZOURAS:

Q. I was trying to figure out what information is contained on here.

A. The first column menu item lists the menu item number, the tangible food items that were consumed by employees.

Q. Okay.

A. Employee Usage column identifies the number of times taken from the other spreadsheets that that menu item was consumed by employees.

Q. By some employee, right?

A. By employees.

172

Q. By employees?

A. Meaning everybody, yes.

Q. Sure. Okay.

And then the next column is the cost for each item?

A. That's the menu price, yes. We had the actual printed menu price that we give to, say, customers.

Q. Got it.

A. That's what a customer would pay for that menu item. So then the last column is the total equivalent menu price where we figured out the menu price of all the employee meals that were consumed.

Q. And if we go to the total on the third page, we see that for this time period, the costs of employee meals to -- well, the cost of meals to employees is $55,634.53?

A. This is not cost to employees, this is the equivalent menu price of the no-charge items that were consumed by the employees.

Q. It's the cost to you?

A. No. This is an equivalent menu price. If I had sold these menu items to a customer, this

173

is what I would have charged.

Q. Understood. Got it. Got it.

And just to be abundantly clear, we don't know which employees consumed which items based on any of the financial analysis you did?

A. On this analysis, everybody is bundled together.

Q. And everybody is bundled together on all the financial analysis you did in connection with this litigation?

A. Yes.

Q. In other words, if I were to ask you whether server Smith ever consumed menu item 416, whatever that is -- we have eight people who did based on this -- you can't tell me if server Smith is included within that group of eight?

A. No.

Q. And you did one of these -- can we call this a summary? What do you want to call it?

A. Sure.

Q. All right. You did one of these summaries that's exemplified by Exhibit 12 for every year 2009, 2010, 2011, 2012?

A. '09-'10, '10-'11, '11-'12.

174

Q. Fair enough.

A. Three.

Q. Fair enough. And based on that information, you then did what? And by information, I'm really talking about -- I think you know what I am talking about, so I will let you answer.

A. From the summary that we just discussed, Exhibit 12, this final number represents if I had sold these menu items to a customer, then this is what I would have charged.

Now we will go back to Exhibit 8. And we know that for every dollar that I would collect, so let's use my -- so the total for the year for 2009, November of 2009 through October of 2010, look at the total at the bottom, so for every dollar that I sold, 19.07 cents is my food cost for that dollar sold, and then 7.42 cents would be for the cost to cook that food.

Combine the two, using that percentage, we can figure out what my cost would be to provide these employee meal items.

Q. I may have lost you. How do we figure that out?

175

A. This percentage is -- this is a percentage of --

Q. Well, what is a percentage?

A. The food cost percentage and the labor cost percentage.

Q. Thank you.

A. The food cost percentage and the cook labor percentage are the percentage of my net sales that I spent for food cost and for labor cost respectively.

Q. And just for laughs, we can call that about 25 percent.

A. Okay. As -- okay. Now, carrying that same percentages over to the Exhibit 12, the total would be $55,634.53, as similar to my net sales. That's my net sales if I would have sold this quantity of food product to customers. Okay? So I use those percentages to convert menu price to my cost.

Q. Because your goal, one of your goals, is to determine what your cost is?

A. What my cost was to provide that food, yeah.

Q. Because you recognize that the menu cost

176

is really not the relevant inquiry?

A. Yeah. Exactly. Again, that's my minimum, bare minimum cost, not the -- for the sake of this calculation, I included food cost and labor cost. There are many other costs associated with this.

Q. Of course.

A. For the simplification of this analysis, we have chosen these two.

Q. Right. And based on this, you, I take it, have conclude at least following the filing of this lawsuit, that 10 cents is -- I don't want to say lawful because you are not a lawyer, but, you know, there is nothing wrong with deducting the 10 cents from the state minimum wage?

A. Well, the analysis continues. We also did a calculation where we added up all the employee meal deductions that were taken out of employees' paychecks.

Q. And you have conducted -- there is a separate spreadsheet for that?

A. Uh --

Q. I think. No?

A. I think we actually gave you the

177

compensation reports.

MR. CONNEALY: Yeah. I don't want if you want to go off the record to describe it?

MR. ZOURAS: Let's do that, yes.

(Whereupon, a discussion was had off the record.)

BY MR. ZOURAS:

Q. We have just had a discussion off the record to kind of expedite things, and you are about to explain what the next steps were to conduct your analysis.

A. Okay. I have the documents in front of me. I don't know what summary was done. Okay. Let's --

MR. CONNEALY: So we are in '09-'10?

THE WITNESS: We have been through all that and through all that (indicating), we've done '09-'10.

BY THE WITNESS:

A. Okay. So we have the equivalent menu price of the meals provided to the employees at no cost. And I would represent that that is $55,634.53.

BY MR. ZOURAS:

Q. Right. And this is for 2009, right?

178

A. Yeah, 2009 to October of 2010.

Q. Right. Okay.

A. From that, we multiplied from Exhibit 8 our percentage for food cost for that dollar value was 19.7 percent, which translates to $10,960.01, and for labor 7.42 percent represented a cost to me of $4,128.09. And you add the two together, my total cost for just food and labor was $15,088.10.

Q. Okay.

A. We did -- for roughly the same time period, went back to the compensation reports, we totalled up all the meal deductions that we had taken from all the employees, and then that total was $4,264.87.

Q. Okay. And, now, I appreciate this, this is listed on your notes, but is there a spreadsheet that sets forth what you are now telling me, like one document? Because I didn't see one, but it may exist.

MR. CONNEALY: Outside of -- I don't know if we could go off the record here.

MR. ZOURAS: Okay.

(Whereupon, a discussion was had off the record.)

179

BY MR. ZOURAS:

Q. By the way, what page are your notes that you are on, so we could follow along.

A. I was on Page 4.

Q. Okay. Great. Got it.

A. And then, obviously, the final conclusion was that we lost $10,822.23 to provide these meals.

Q. Got it. For the time period of November 2009 to October of 2010?

A. Correct.

Q. And you did a similar analysis on Page 5 for the other years, yes?

A. Are we referring to my notes?

Q. I am.

A. Okay. Yes, there was for 2010 to 2011, then on Page 6 -- let me just make sure I got this right. And then on Page 6 was for the year 2011, November of 2011 to October 2012.

Q. All right. And these figures are accurate, as far as you know?

A. Yes.

Q. You prepared them yourself?

A. Yes.

180

Q. That speeds things along tremendously. You have no idea.

A. And, again, this only represents the costs that we included, and there are significant other things that are not included to me in these numbers.

Q. All right. Here is what I would like to do. I would like to take a quick break and look at my notes and hopefully wrap this up.

MR. CONNEALY: Okay.

(Whereupon, a break was taken from 2:20 to 2:27 p.m.)

BY MR. ZOURAS:

Q. Steve, you recognize you are still under oath?

A. I do.

Q. Could we go back to your notes, please, Exhibit 1.

A. Yes.

Q. If you could turn to Page 4, which is the page we were on earlier.

A. Yes.

Q. We talked about the analysis for November 2009 to October 2010.

181

A. Yes.

Q. And number 9 there you have already testified indicates that Zimmie's lost $10,823.23 providing no-charge menu items to its employees, correct?

A. Correct.

Q. So do you have any way of figuring out how much of that almost $11,000 was for no-charge menu items consumed specifically by servers?

A. No.

Q. Do you have any way of knowing what percentage of that figure was for servers?

A. That's the same thing as knowing the dollar value.

Q. And that would be true for any category of employee I could ask you about, be it servers, hosts, busboys, kitchen staff, management?

A. Correct.

Q. So what this indicates is that these losses are for food provided to all employees, not just servers?

A. Correct.

Q. And this assumes that servers were consuming meals probably on a regular basis, yes?

182

A. I don't know how to answer the question. I mean, that's -- I don't understand it.

Q. Let me give you a hypothetical, and I agree it's going to be an extreme one, but if we had proof that no server ever ate a meal at your restaurant, you agree that this figure would really have no relevance to this lawsuit?

A. Yes.

Q. But we don't know exactly how many meals servers -- an individual server may have consumed or how even servers as a group consumed, yes?

A. Well, but we do know they consumed. I mean, I've seen them myself. I mean, so then your hypothetical is extreme and really not relevant to this case.

Q. But we don't know how many?

A. I can't give you a total, but a significant portion of it, yes, are servers.

Q. But we are not able to define any group?

A. I can't give you an exact definitive number, but yes, like I said, a good chunk of it is servers.

Q. And that is basically your information you got from management?

183

A. My observations.

Q. Only your observations?

A. No, I've spoken to management about it as well.

Q. So it is based on the observations of you and management?

A. Yes.

Q. And nothing else?

A. Well, obviously, the data here and --

Q. But the data here doesn't tell us anything about the servers specifically, right?

A. Excuse me?

Q. The data here doesn't tell us anything specifically about the servers?

A. The management, and I've spoken to servers. No, I mean, I guess I have actually spoken with servers about it as well. I mean, I've seen them and talked with them. Restaurant employees in general, yes, I've talked with them on a regular basis.

Q. Did you ever investigate whether it was possible to set up the POS system so that each individual server would have a record of which meals they consumed?

184

A. No, I didn't think it was a requirement for us to do that, so we've never gone down that road.

Q. And do you know as you sit here whether or not that is possible?

A. Is it possible? I don't know. I --

Q. Okay. And just so you understand my question, I am just trying to figure out whether or not you know whether we could set up a POS system at your restaurant or the POS system at your restaurant where the server could use a personalized I.D. number to register for an employee meal as opposed to using the 444 code that all employees use?

A. Again, you know, we haven't gone down that road. I don't believe it's a requirement for us to do that, so --

Q. All right. And you don't know if it's possible or not?

A. I would have to ask the vendor. I assume it would be some fashion (in some fashion we would be able to do that.

Q. All right. And the way in which the employee meal policy works today is exactly the

185

same as it has worked over the course of the last four years, right?

A. The concept has been the same and, obviously, we have had to change from a manual system to a computer system, but the concept, yes, is the same.

Q. You haven't made any changes in your policy as a result of this lawsuit, right?

A. No.

Q. Or for any other reason?

A. No.

Q. Okay. Can we go to your notes again, Page 1. This is Exhibit 1, just for the record. Under Exhibit -- or, I'm sorry, under subheading it's I(b)(4), you say that, "We will allow an employee to opt out if they want," meaning out of the meal credit benefit, yes?

A. Yes. I mean, I lose money every time they order food, so yes, it makes sense for me to allow them to opt out.

Q. And we talked about earlier how if an employee went to you tomorrow and said, "I want to not be included in that," you would allow it, right?

186

A. Yes. It could be any day.

Q. All right. And is there any other way, other than what we have talked about today, that you advised employees that they are free to opt out of a meal credit benefit if they choose?

A. I mean, other than verbal through management, but again, it's such a huge benefit to my employees and such a part of the culture, everybody takes advantage of this, everybody uses it, it's very highly unlikely that they'd want to drop this.

Q. Well, you would agree that this meal credit benefit, the 10 cents, was something that was instituted by your restaurant, right?

A. I don't understand why --

Q. You agree the employees didn't come to you themselves and say, "Hey, we want to set it up this way," right?

A. The policy predates, I think, pretty much anything that --

Q. We already talked about it.

A. Right.

Q. And if the employee doesn't opt out, that is the way it is going to be, right?

187

A. Yes. But, again, I haven't had an employee that's wanted to opt out.

Q. Well, do you agree with me that they first need to know that they can opt out?

A. People who don't like something often say they don't like it, and we deal with those situations and we deal with them very seriously.

MR. ZOURAS: I have nothing further at this time. Thank you.

MR. CONNEALY: All right.

EXAMINATION

BY MR. CONNEALY:

Q. Well, Steve, I have a few things just to clear a few points of confusion up.

So you testified earlier that you have an OPH Management office in Orland Park, Illinois, correct?

A. Right.

Q. Okay. Now, I think you might have been confused because the attorneys had discussed this issue previously, but this office is affiliated with #7 Zimmie's to the extent you perform some of your owner/operator duties there?

A. I use the space, yes.

188

Q. Okay.

A. For some things that I do for #7 Zimmie's, but the business is not associated with #7 Zimmie's.

Q. Okay. You also testified about the tip credit notification requirements and that they changed sometime -- I think you said sometime around 2012. I don't have your testimony, of course, right in front of me, but I was going to direct you back to Exhibit No. 2 that we have reviewed because it says right here -- let me know when you get there. No. 2.

A. I'm sorry.

Q. That's all right.

A. Yes.

Q. It says here that the tip credit regulations changed or became effective May 5th, 2011.

So is it more accurate -- I think you said a couple years you weren't sure, maybe 2012. Is it more accurate to say that you started doing these notifications by at least May 2011?

A. Yes, more likely April of 2011. Yeah.

Q. Okay.

189

A. Because these are anyone that was hired after this date.

Q. Got you. And then we also discussed the credit with Mr. Zouras and that that basically gives employees access to a lot of the free menu items, or it gives access to all the free menu items and all the beverages largely for free, or all for free, correct?

A. Yes, and more. You know, we allow employees to bring in some -- let's say somebody brought, as an example, some skirt steak and they wanted to do fajitas. They would use my food for the peppers and the onions and all that stuff, and they would create a meal for everybody who would bring in the meat part, and none of that is run through the system. So, I mean, as a minimum, it's the free of charge items, the no-charge items, but it's even more.

Q. Now, you also discussed these discounted meals where the employees do incur a fee, you know, discounted under the menu price.

So is that 10-cent deduction that is the meal credit linked to the discounted meals?

A. No, it's a separate benefit.

190

It's -- you know, that amount of money I'm charging them has nothing to do with payroll. They go to the cash register and pay for that food separately and independently. It would be the same as if that employee went down the street to Subway or McDonald's and bought something, except at our location they have a -- they get a discounted rate. That's the one thing. So that's not part of the meal program.

Q. So that's there, just if they want to go off the free menu, they can, basically?

A. Correct.

Q. Okay. So now I am not quite sure if we did this or not, but for Exhibit No. 1, your notes, so we established you authored those notes yourself?

A. I did.

Q. And you attest that all the facts contained within those notes are based on your own personal knowledge or your own investigation of the facts of this case?

A. Yes.

Q. So the facts contained in these notes in Exhibit 1 are truthful and accurate to the best of

191

your knowledge?

A. Absolutely.

MR. CONNEALY: That's all I've got, sir, unless you have some.

FURTHER EXAMINATION
BY MR. ZOURAS:

Q. Well, Steve, based on your, you know, analysis that you did following learning about this lawsuit, do you believe you could probably take, for example, a 20-cent hourly deduction?

A. I haven't calculated the number, but I could increase that, yes.

Q. And do you know how high you could probably increase it, based on your analysis?

A. Again, I haven't worked those numbers, but there is an amount that I could go up to, yes.

Q. And you haven't figured out what that amount is?

A. No. I have no interest in doing that.

Q. Well, whether you have an interest or not, do you have a way of doing it?

A. Well, I would just use the analysis that I conducted here.

Q. What would you do to find the maximum

192

amount you could deduct on an hourly basis?

A. Hypothetically if I was going do that?

Q. Exactly.

A. Figure out what the -- actually, you know what, I don't know. I'd have to spend some time to think about that.

Q. Suffice it to say, you would have to figure out a way to, for lack of a better word, recoup the $10,000 of loss that you are showing for the various time periods, right?

A. If my intent was to recoup the money, that's what I would do.

Q. Well, I assume your intent would be to do this properly, so in order to do it properly and not run into any legal trouble, you would want to show that you were just trying to recoup your losses, right?

A. You are assuming that I would want to recoup your losses.

Q. Right.

A. I'm fine with the program as it is. I have totally demonstrated that I lose money every time somebody eats food in my restaurant. I have no intention of changing that. I don't see where

193

you are going with this.

Q. I am just trying to figure out what you would need to do hypothetically -- you know, I mean, I am getting the feeling or the understanding that you could conceivably charge a lot more than 10 cents an hour and there would be nothing wrong with that, as far as you are concerned?

A. Again, this 10-cent value was established in 1976. It hasn't changed since.

Q. I know. I know.

A. It benefits to my company in terms of good will and employee morale and retaining of employees. It's tremendous. So I have no interest in changing this.

Q. But you would agree with me that you could retain employee morale and so forth if you didn't have a meal credit at all, right? It could be zero, correct?

A. This is tremendously effective. It's proven. It's tested. It works very, very well for us.

Q. Is what I said correct?

A. I'm sorry?

Q. Is what I said correct, in your opinion?

194

A. Is it possible? I couldn't answer that question.

MR. ZOURAS: I have nothing further. Thank you very much.

MR. CONNEALY: Thank you.

MR. ZOURAS: We are going to order. Can you take the exhibits.

THE REPORTER: Yes.

MR. ZOURAS: I think we understand the agreement. We only need the e-mail, if that's okay.

MR. CONNEALY: If we could get the Etranscript as well, and we will forego signature at this time, and we'll -- no, go through it.

MR. ZOURAS: You will?

MR. CONNEALY: Yeah.

MR. ZOURAS: So we should probably keep it on the record that they want to go through the signature process.

FURTHER DEPONENT SAITH NOT

195

STATE OF ILLINOIS   )
                    ) SS:
COUNTY OF C O O K   )

I, ANDREW R. PITTS, a Certified Shorthand Reporter within and for the State of Illinois, do hereby certify that heretofore, to-wit, on November 6, 2013, personally appeared before me, at 205 North Michigan Avenue, Suite 2560, Chicago, Illinois, STEVEN STANLEY SCZUREK, in a cause now pending and undetermined in the United States District Court for the Northern District of Illinois, Eastern Division, wherein NICOLE D'AGOSTINO and CHELSEA SCHNEIDER, Individually, and on Behalf of All Others Similarly Situated is the Plaintiff and #7 ZIMMIE'S, INC., d/b/a THE ORIGINAL PANCAKE HOUSE, LISA LAROCHE-SCZUREK, and STEVE SCZUREK are the Defendants.

I further certify that the said STEVEN STANLEY SCZUREK, was first administered an oath to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported

196

stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing 30(b)(6) deposition was reserved by counsel for the Defendant and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I certify to the above facts this 12th day of November, 2013.

ANDREW R. PITTS, CSR,
LICENSE NO.: 084-4575

197

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICOLE D'AGOSTINO and CHELSEA )
SCHNEIDER, Individually, et )
al., )
)
     Plaintiff, )
)
    vs. ) No. 1:12-cv-9162
)
#7 ZIMMIE'S, INC., d/b/a THE )
ORIGINAL PANCAKE HOUSE, et )
al., )
)
    Defendants. )

I, STEVEN STANLEY SCZUREK, being first administered an oath, say that I am the deponent in the aforesaid deposition taken on November 6, 2013; that I have read the foregoing transcript of my deposition, and affix my signature to same.


        STEVEN STANLEY SCZUREK


Subscribed and sworn to before me this     day of     , 2013.


    Notary Public

---

198

ERRATA SHEET

CASE NAME: NICOLE D'AGOSTINO v. #7 ZIMMIE'S, INC.
CASE NUMBER: 1:12-cv-9162
WITNESS: STEVEN STANLEY SCZUREK
REPORTER: Andrew R. Pitts
I wish to make the following changes for the following reasons:

PAGE   LINE

_____ _____ CHANGE:_____

REASON:_____

_____ _____ CHANGE:_____

REASON:_____

_____ _____ CHANGE:_____

REASON:_____

_____ _____ CHANGE:_____

REASON:_____

_____ _____ CHANGE:_____

REASON:_____

_____ _____ CHANGE:_____

REASON:_____

_____ _____ CHANGE:_____

REASON:_____

_____ _____ CHANGE:_____

REASON:_____

_____ _____ CHANGE:_____

REASON:_____

_____ _____ CHANGE:_____

REASON:

---

199

PAGE   LINE

_____ _____ CHANGE:_____

REASON:_____

_____ _____ CHANGE:_____

REASON:_____

_____ _____ CHANGE:_____

REASON:_____

_____ _____ CHANGE:_____

REASON:_____

_____ _____ CHANGE:_____

REASON:_____

_____ _____ CHANGE:_____

REASON:_____

_____ _____ CHANGE:_____

REASON:_____


In accordance with Supreme Court Rule 207(a), the above

corrections are made to correct an error in the

reporting or transcription of my answer(s).


Signed:_____


Date:_____

---

ANDREW R. PITTS, C.S.R., R.P.R.
3013 West 54th Street
Chicago, Illinois 60632

November 12, 2013

Mr. Robert D. Connealy
Gordon & Rees LLP
One North Franklin Street
Suite 800
Chicago, Illinois 60606

IN RE: NICOLE D'AGOSTINO v. #7 ZIMMIE'S, INC.
COURT NUMBER: 1:12-cv-9162
DATE TAKEN: 11/6/2013
DEPONENT: STEVEN STANLEY SCZUREK
Dear Mr. Connealy:
Enclosed is the 30(b)(6) deposition transcript for the aforementioned deponent in the above-entitled cause. Also enclosed are additional signature pages, if applicable, and errata sheets.

Per your agreement to secure signature, please submit the transcript to the deponent for review and signature. All changes or corrections must be made on the errata sheets, not on the transcript itself. All errata sheets should be signed and all signature pages need to be signed and notarized.
After the deponent has completed the above, please return all signature pages and errata sheets to me at the above address, and I will handle distribution to the respective parties.

If you have any questions, please call me at the phone number below.
_____ Procedure outlined in Rule 207 (a) of
    the Illinois Supreme Court Rules

_____ Procedure outlined in Rule 30 (e) of
    the Rules of Civil Procedure for the
    U.S. District Courts
Sincerely,

Andrew R. Pitts, CSR, RPR
(312) 752-6337

Cc: Mr. James B. Zouras